## MILLER *v.* THE STATE.

A constitution of New York, made in 1826, ordains that "corporations may be formed under general laws, but shall not be created by special act except in certain cases;" and also "that all general laws and special acts, passed pursuant to this section, may be altered from time to time or repealed." And a *statute of New York*, passed A.D. 1828, enacts that "the charter of every corporation that shall be thereafter granted by the legislature shall be subject to alteration, suspension, and repeal, in the discretion of the legislature."

In this state of things, a general railroad law was passed in 1850, authorizing the formation of railroad corporations with *thirteen* directors. The formation of a company under this general law being subsequently contemplated, with a capital of $800,000, to build a road fifty miles long, the legislature authorized the city of Rochester to subscribe $300,000 to it; and enacted that if the company accepted the subscription, the city should appoint one director for every $75,000 subscribed by it, that is to say, should appoint four directors out of the thirteen contemplated; the other stockholders, of course, appointing the remaining *nine.* The company did accept the subscription, and the stockholders other than the city subscribed $677,500; but paid up only $255,000. Then the enterprise for all but eighteen miles of the road was abandoned. The city had paid its $300,000 subscribed. In 1867 the legislature passed another act giving the city power to appoint one director for every $42,855.57 of stock owned by the city; in other words establishing the same ratio that existed among the subscribers for the stock at the time the original subscription was made. The effect was to give the city *seven* directors and to leave the other stockholders but six. These last stockholders, regarding the act of 1851 as making a contract that they should have nine directors and the city but four, and that the act of 1867 violated that contract, elected their old nine. *Held*, on a *quo warranto*, that the act of 1867 did not, in view of the State constitution and the act of 1828 making charters subject to alteration, suspension, and repeal, make such a contract, and that the act of 1867 was constitutional.

ERROR to the Supreme Court of New York; the case being thus:

Section 1 of article 8 of the constitution of the State, just named, adopted by it A.D. 1826, ordains as follows:

"Corporations may be formed under general laws, but shall not be created by special act except in certain cases. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

And title 3 of chapter 18 of the first part of the Revised Statutes of 1828, enacts thus:

"The charter of every corporation that shall hereafter be granted by the legislature shall be subject to alteration, suspension, and repeal, in the discretion of the legislature."

With this provision of the constitution and this enactment of the Revised Statutes of the State in force, the legislature of New York passed in 1850 a general act for the formation of railroad companies and the regulation of the same. This act authorized any number of persons, not less than twenty-five, to form a company for the purpose of constructing, maintaining, and operating railroads for public use, . . . and for this purpose to make and sign articles of association in which the name of the company should be stated, the places from which and to which the road was to be constructed, the amount of the capital stock, which should not be less than $10,000 for every mile of road constructed, the number of shares of which the capital stock should consist, and the names and places of residence of *thirteen* directors of the company who should manage its affairs for the first year, and until others were chosen in their place. Each subscriber was to state what number of shares he would take; and the articles were to be filed in the office of the Secretary of State, and after certain formalities gone through with them, the persons who had subscribed the articles of association, and all who should become stockholders in the company, "shall," says the act "be a corporation by the name specified in such articles of association, and shall possess the powers and privileges granted to corporations, *and be subject to the provisions contained in title* 3 *of chapter* 18 *of the first part of the Revised Statutes.*"*

The formation of a railroad company to be styled the Rochester and Genesee Valley Railroad Company, and to run between the city of Rochester and the town of Portage, fifty miles south of it, being contemplated by a course which

---

* The provisions last above quoted; at the top of the page.

should run through the town of Avon, about eighteen miles
south of Rochester, an act of the State just named amend-
ing the charter of that city was passed July 3d, 1851, by
which its common council were authorized to borrow upon
its credit $300,000, to be invested in the stock of the new
company, and by virtue of the subscription thus authorized,
the city was declared to acquire all the rights and privileges
and be liable to the same responsibilities as other stock-
holders of the company, except as otherwise provided in the
act.  In case the railroad company elected to receive the
subscription, the common council were authorized to nomi-
nate and appoint one director for every $75,000 of capital
stock held by the city at the time of each election of direc-
tors, but the city could have no voice in the election of the
remaining directors.  On the 10th of July, 1851, the arti-
cles of association of the new company were filed in the
office of the Secretary of State, organizing the corporation
under the general railroad act of 1850, already in part
quoted.  The corporation was declared in the article to be
created for the purpose of constructing, owning, and main-
taining a railroad from the city of Rochester to the town of
Portage, a distance, as already said, of fifty miles, with a
capital stock of $800,000, divided into 8000 shares of $100
each.  On the 15th of June, 1852, the mayor of Rochester
subscribed for 3000 shares of the stock of the company, and,
on the same day, at a meeting of the directors of the rail-
road, such subscription was unanimously accepted.  Other
parties subscribed for stock to the amount of $677,500, so
that the whole amount subscribed, including the stock taken
by the city, was $977,500.  The whole amount of capital
stock fully paid up was:

| | |
|---|---:|
| By the city of Rochester, . . . . . . | $300,000 |
| By all other parties, . . . . . . . | 255,200 |
| Total amount, . . . . . . . | $555,200 |

The balance of the stock subscribed was extinguished or
forfeited before March 9th, 1867.  Before this time also the
Rochester and Genesee Valley Railroad Company had aban-

doned the construction of their road south of Avon, and assigned all their rights and franchises beyond that point to another corporation.

On the 9th of May, 1867, an act was passed, amending the act of 1851 by giving the common council authority to appoint one director for every $42,855.57 of stock owned by the city; in other words, establishing the same ratio that existed among the subscribers for stock at the time the original subscription was made. The effect of this act was to give the city of Rochester power to appoint seven of the thirteen directors, and the other stockholders six. At the next annual election, however, the stockholders, other than the city, alleging that the act of July 3d, 1851, made a contract between the city and the other stockholders, that the city should elect but four directors out of the thirteen, and that the act of 1867, authorizing the election of seven, violated the obligation of that contract, proceeded to elect one Miller and eight others directors as the directors eligible by them; and on the same day the common council, in pursuance of the act of 1867, appointed seven other persons as directors eligible by *them.* Thereupon, the attorney-general of New York, on the relation of Powers and the six other directors appointed by the city, issued a *quo warranto* against Miller and his eight co-directors; and the case coming to the Court of Appeals that court held that the appointment by the city was valid, and the election of the nine directors by the other side irregular. Miller and his co-directors now brought the case here.

The only question involved was the constitutionality of the act of 1867. If that act was constitutional the decision of the State court was correct, and was to be affirmed. If the act was a violation of the Constitution of the United States, the decision was erroneous and was to be reversed.

*Messrs. Theodore Bacon* and *H. R. Selden, for the plaintiff in error,* argued the case orally, and submitted also the opinions of certain of the judges in the court below who dissented from the judgment there. A part of one follows:

The act of July 3d, 1851, made it lawful for two corporations to enter into an arrangement by which one of them might become a stockholder in the other if both should consent, and declared what the rights of the parties to the arrangement should be as between each other if they availed themselves of this permission. There was no exercise of legislative will further than to confer this power; all beyond that depended upon the mutual consent of the parties.

The making and the acceptance of the subscription to the stock were acts of the parties, and they thereby adopted the conditions contained in the act of the legislature and mutually consented to be governed by them. The consent of each party must be deemed to have been given in consideration of the obligation thus assumed by the other, and a valid contract was thus made between the subscriber to the stock and the other stockholders of the railroad company, or the company representing the rights of such stockholders, unless it can be shown that the subject-matter of the arrangement was one concerning which a contract could not be made or authorized by the legislature to be made.

The city of Rochester, by this arrangement, secured to itself the right of appointing four out of the thirteen directors. This was a valuable right, for in its absence, if the stock of the company should all be paid up, the city holding but a minority of the stock might not have been able to obtain the election of any director of its selection. In consideration of this privilege the city surrendered to the other stockholders the right to elect the remaining nine directors. The railroad company, in consideration of that surrender, bound itself to admit the four city directors. Neither party can be presumed to have acted on the assumption that this arrangement could be changed without its consent. It may well be supposed that those interested in the company and who had embarked, or were about to embark, their capital in it, would not have consented to place so large an amount of stock in the hands of the city, had they not been secured against the possibility of the control of the affairs of the company becoming invested in so changing and uncertain a

body as a municipal corporation, whose officers would have no personal interest in the road and no special inducement to manage it in the interest of its stockholders.

It will be argued, however, that the power reserved in the constitution and statutes of the State of New York, to alter, suspend or repeal the charters of all corporations, gives power to the legislature to change the terms upon which the subscription was received, and to enlarge the number of directors to be appointed by the city, and that the act of 1867, which purports to authorize the city to appoint seven directors instead of four, thus giving to the city the majority instead of a minority representation in the board, is valid as an amendment of the charter of the railroad company.

The purpose and object of this reservation of power is generally conceded to have been to prevent the alienation by the State of corporate franchises, in such form that they could be held as against the State free from that legislative control which the public interests might from time to time require. When it was settled by the Supreme Court of the United States that an unconditional charter to a private corporation was a contract between the State and the corporation, which could not be impaired by State laws, and that franchises thus granted could never be withdrawn, several of the States resolved to make no more such irrevocable contracts, and either by general laws or provisions in the charters themselves inserted the condition that such charters might be altered or repealed.

In New York the constitution has deprived the legislature of the power of granting irrepealable charters, and there is now no power to make a grant of this description which shall operate as an irrevocable contract on the part of the State. But this reservation is for the benefit of the State alone, and affects only the relations between it and the corporation. The exercise of this reserved power may, undoubtedly, indirectly affect private rights and interests which are dependent upon the powers and franchises of the corporation itself, but no others. The individual rights and interests of the members of the corporation, or of persons

dealing with it, cannot be acted upon directly by the legislature even under the form of an amendment of the charter. A contract between individuals or between a corporation and individuals is not subjected to the action of the legislature by the mere fact that it is embraced in a charter or an amendment to a charter, or results from a dealing had with reference to such an enactment. The State has power to revoke its own contracts where it has in making them reserved such right. But it has no power to impair the lawful contracts of its citizens, or even of corporations created by it. When such contracts relate to the rights of individuals and not to the powers of the corporation, any attempt to reserve such a power would be ineffectual. And a State constitution is no more effectual for such purpose than a statute.*

In *Zabriskie* v. *Hackensack and New York Railroad Co.*,† the doctrine is stated, that the reservation in a charter that the State may at any time alter, amend, or repeal it, is a reservation of the State for its own benefit and is not intended to affect the rights of corporators as between each other; that it does not empower the State to authorize one part of the stockholders for their own benefit and at their mere option to change their contract with the other part, but is confined to the powers and franchises granted to the corporation by the charter. And although in the case cited the doctrine was applied in a manner inconsistent with some of our own adjudications, none of the latter will be found to conflict with the doctrine itself.

In *Oldtown and Lincoln Railroad Co.* v. *Veazie*‡ the charter required that not less than 11,000 shares should be subscribed before the subscriptions could be enforced by calls. The defendant subscribed for 1000 shares. Only 9500 shares were subscribed in all. A supplemental act was then passed, reducing the limit to 8000 shares. It was held that the reserved power to amend the charter did not authorize a

---

* Dodge *v.* Woolsey, 18 Howard, 331.     † 3 C. E. Greene, 178.

‡ 39 Maine, 571.

change in the liability of the stockholders as between them-
selves.*

The cases of *Sherman* v. *Smith*† and *The Reciprocity Bank*,‡
which will probably be relied upon by the other side, are in
strict accordance with these views.   The alterations in char-
ters there, related to the franchises. . One of the chief privi-
leges which may be granted by an act of incorporation is
that of doing business as an aggregate body without that
individual liability of the members which, but for the incor-
poration, would necessarily attach.   By the amendatory acts
the prospective enjoyment of that privilege was taken away
from corporations there.   No attempt was made to impose
on the members liability for existing contracts of the corpo-
ration.   The amendment affected the whole body alike, and
declared that for all contracts the corporation should make
after January, 1850, the members should be liable.   This
was clearly within the scope of the power reserved, and
essentially different from the present case.   In all the adju-
dications to be found in which the exercise of this power
has been maintained the amendment has related to the cor-
porate franchises and only incidentally affected the rights of
the stockholders, through the interest which they had in the
franchises of the corporation itself, and affected the interests
of all the stockholders alike.   The cases which have gone
the greatest length in support of this power§ are within this
limit.   They are those in which the corporate powers have
been enlarged after subscriptions to the stock, and the sub-
scribers held not to be discharged by this enlargement of
the corporate enterprise.   In these and kindred cases the
alteration affected purely the powers and duties of the cor-
poration in its relations to the State and to the public, and
the subscriber to stock as well as the purchaser of stock

---

* And see Hawthorn v. Calef, 2 Wallace, 10; Woodruff v. Trapnall, 10
Howard, 190; Curran v. The State, 15 Id. 304.

† 21 New York, 9, and 1 Black, 587.        ‡ 22 New York, 9.

§ Schenectady and Saratoga Plankroad Co. v. Thatcher, 11 New York,
102; Buffalo and New York City Railroad Co. v. Dudley, 14 Id. 336.

must be deemed to have contracted with reference to the conceded power of the legislature over those subjects.

There are other acknowledged limits to the exercise of the reserved power of amendment where it trenches upon vested rights or rights of property of the corporation. In *Commonwealth* v. *Essex Company*\* the doctrine is maintained that, "when under power in a charter rights have been acquired and become vested, no amendment of the charter can take away the property or rights which have become vested under the legitimate exercise of the powers granted." See also *Durfee* v. *Old Colony Railroad*† and *Roxbury* v. *Boston and Providence Railroad*.‡

It will be argued, however, that, conceding the principle that contracts between the corporation and its stockholders, though resulting from provisions of the charter, may be protected by the Constitution of the United States when they do not relate to the franchises of the corporation, yet the right of stockholders to vote on their stock or to appoint the directors or managers of the company is a chartered right and subject to the reservation in the State constitution.

This position necessarily leads to the result that the right of stockholders in private business corporations to vote upon their stock is wholly under the control of the legislature; that it cannot be secured by any contract; and that whether claimed under the provisions of the charter or under a contract made in pursuance of legislative authority, it may at any time be taken away *in toto* from the stockholders by a mere exercise of the will of the legislature; or it may be taken from a portion and vested in the residue.

This result is inevitable, for if the right of voting and the extent of the voice which each stockholder shall have in the management of the property and the affairs of the corporation are mere charter rights or franchises created by the act of incorporation, and within the scope of the power to suspend, alter, and repeal reserved in the constitution, they cannot, even by authority of the legislature, be withdrawn

---

\* 13 Gray, 239.     † 5 Allen, 230, 240, 247.     ‡ 6 Cushing, 424.

from the exercise of that power, and they can at any time be taken away entirely from the stockholders without their consent.

The most essential element of a right of property is the right to manage or control the management of the object which is in common parlance designated as property.

Is it argued that by investing property in a corporate enterprise, the owner consents to subject its management to the control of the legislature?

This is true to a certain extent; but the fallacy of this argument as applicable to the point now in question consists in the omission to qualify the extent to which the owner has, by thus investing his property, parted with his own power over it.

He has doubtless restricted himself to the use of the property while so invested, in such business as the State may sanction, and through such agencies as the State may permit him to appoint; but he has not consented to part with his control over its management within those limits.

The legislature which creates the artificial body must necessarily have power to prescribe the organs through which it shall act. But this is a different thing from arbitrarily taking possession of the corporation itself, and through it of the property of the parties for whose benefit the corporation was created. They cannot be presumed to have anticipated that a charter giving them the privilege of managing their property for their own benefit, in a certain way, could be transformed by this reserved power of amendment into a vehicle which should transfer from them to the State, or its appointees, all control over the property which they have invested in the corporate enterprise. To hold such a doctrine would be to place all property invested in corporate enterprises beyond the pale of the protection of the Federal Constitution. Such an act would approach nearer to one of confiscation than of legislation.

It is no answer to say that the act of 1867 works so as to secure an equitable result. If the arrangement which it assumes to change was a contract, it makes no difference

whether it was unduly beneficial to one party or another. The legislature has no power over it.

It is a misnomer to call the act of 1867 an amendment of the charter of the railroad company. It affects no corporate right or franchise of the company. Its more appropriate description would be "An act to enlarge the rights of one of the stockholders of the company."

*Mr. J. C. Cochrane, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Corporate franchises, granted to private corporations, if duly accepted by the corporators, partake of the nature of legal estates, and the grant, under such circumstances, if it be absolute in its terms, and without any condition or reservation, importing a different intent, becomes a contract within the protection of that clause of the Constitution which ordains that no State shall pass any law impairing the obligation of contracts. Charters of private corporations are regarded as executed contracts between the State and the corporators, and the rule is well settled that the legislature, if the charter does not contain any reservation or other provision modifying or limiting the nature of the contract, cannot repeal, impair, or alter such a charter against the consent or without the default of the corporation, judicially ascertained and declared. Subsequent legislation, altering or modifying such a charter, where there is no such reservation, is plainly unauthorized, if it is prejudicial to the rights of the corporators, and was passed without their assent. Where such a provision is incorporated in the charter, it is clear that it qualifies the grant, and that the subsequent exercise of that reserved power cannot be regarded as an act within the prohibition of the Constitution.* Such power also, that is the power to alter, modify, or repeal an act of incorporation, is frequently reserved to the State by a general law applicable to all acts of incorporation, or to certain

---

* Pennsylvania College Cases, 13 Wallace, 213.

classes of the same, as the case may be; in which case it is equally clear that the power may be exercised whenever it appears that the act of incorporation is one which falls within the reservation, and that the charter was granted subsequent to the passage of the general law, even though the charter contains no such condition, nor any allusion to such a reservation.*

Matters of fact, though not in dispute, must be first ascertained, in order that the questions involved in the case may be properly presented for decision. Briefly stated the material facts are as follows, as appears by the finding of the court of original jurisdiction, and from the concessions of the parties:

That the railroad company is a corporation duly organized under the general railroad act of the State, passed on the 2d of April, 1850, and that the articles of association were, on the 10th of July, of the succeeding year, filed in the office of the secretary of state; that the articles of association provided for the construction of a railroad from Rochester to Portage, a distance of fifty miles, with a capital of eight hundred thousand dollars, to be divided into shares each for one hundred dollars, as therein specified; that the stock subscribed for the corporation, paid and unpaid, amounted to nine thousand seven hundred and seventy-five shares, of which only five thousand five hundred and fifty-two shares were ever fully paid, and for which certificates have been issued. Authority was conferred upon the city of Rochester, by an act to amend the charter of the city, to subscribe for or purchase stock of that railroad company to the amount of three hundred thousand dollars, and the provision was that by virtue of that subscription or purchase the city should acquire all the rights and privileges, and be liable to the same responsibilities as other stockholders of said company, except in certain particulars not necessary to be mentioned.† Pursuant to that authority the proper officers of

---

* Fletcher v. Peck, 6 Cranch, 136; Terret v. Taylor, 9 Id. 51.

† Session Acts 1851, p. 768.

the city subscribed for that amount of the stock of the railroad company, and it appears that the proper officers of the railroad company elected to receive the subscription, and that the full amount of the subscription was paid, and that the certificates of the shares were duly issued to the city, and that the city has ever since been the holder and owner of the whole number of said shares. Power was also conferred upon the city, in case the company "elected to receive their subscription," to nominate and appoint one director for every seventy-five thousand dollars of capital stock held by the municipality, at the time of each election of directors, but the further provision was that the city should have no voice in the election of the remaining directors; consequently the common council of the city, at the time of each annual election of directors, elected four— the number being limited by law to thirteen—and the other stockholders elected nine, without any interference from the city authorities. Complaints arose from the fact that four hundred and fifty-two thousand and three hundred dollars of the stock, subscribed by parties other than the city, had never been paid in, nor had certificates ever been issued for any part of that unpaid subscription. On the contrary, the same was not in existence as stock, having long before been extinguished and forfeited for non-payment, in consequence of which the railroad company had abandoned the construction of their road south of Avon, and assigned all their right of way, property, and franchises beyond that point to another corporation, so that their railroad as constructed and operated terminates at Avon, and is only eighteen and three-fourth miles in length. Control of the railroad, by a change of circumstances not contemplated when the plan was organized, being in the hands of stockholders owning a minority of the stock, the legislature of the State, on the 9th of March, 1861, enacted that the common council of the city should "have the power to nominate and appoint one director of the company for every forty-two thousand eight hundred and fifty-five dollars and five-sevenths of a dollar of capital stock of the said railroad company held by

the said city, at the time of each election of directors of said company."*　Thereafter the common council of the city, as the plaintiffs claim, became entitled at each annual election of directors to elect seven of the number allowed by law, and that the other stockholders were entitled to elect the remaining six only, as authorized by the apportionment prescribed by the amendatory act of the legislature.　Accordingly the common council of the city, at the annual election held in June of the succeeding year, elected seven directors, but the other stockholders, denying the validity of the amendatory act, elected nine directors under the old law, and the persons so chosen immediately entered upon, used, and exercised the said offices as directors of said corporation, and without any warrant or authority, as insisted by the plaintiffs.　Deprived of their rights as defined by the amendatory act the plaintiffs brought the present action, in the nature of a writ of *quo warranto*, in the Supreme Court of the State, alleging that the nine directors elected by the other stockholders have usurped the offices of directors of the railroad company.　Service was made and the defendants appeared and filed an answer.　Hearing was had, and the Supreme Court rendered judgment for the plaintiffs, and the defendants transferred the cause to the Court of Appeals, where the judgment was affirmed; thereupon the losing party sued out a writ of error and removed the record into this court.　They seek to reverse the judgment of the State courts upon the ground that the act of the State legislature, authorizing the common council of the city to elect seven of the thirteen directors in the railroad company, is unconstitutional and void as repugnant to their act of incorporation, and in support of that theory they submit the following propositions: (1.) That the signers of the beforementioned articles of association, when the articles were filed in the office of the secretary of state, became a corporation by the name specified in those articles, with all the powers and privileges granted by the general law of the

---

* Sessions Acts 1867, p. 92.

State upon that subject.* (2.) That the powers and privileges thus conferred were granted by the State, and that the grant, as an act of incorporation, became and was an executed contract. (3.) That the powers and privileges of the charter are prescribed and defined in the general railroad law of the State. (4.) That the persons named as corporators in a charter cannot be compelled to accept the act of incorporation, nor any modification or extension of the powers and privileges granted, whether conferred or modified or extended, by a special act or by virtue of a general law. (5.) That a contract created by an act of incorporation, when once complete, is unalterable by either party without the consent of the other.

Undoubtedly the powers and privileges of the railroad company in this case are the same as they would have been if the company had been incorporated by a special act, and it may also be conceded that the charter, when the articles of association were filed in the office of the secretary of state, became an executed contract, subject to the restrictions ordained by the constitution of the State, and to the reservations contained in the general law of the State relating to corporations, and also in the general railroad act, which it is admitted prescribes and defines the powers and privileges of the railroad company.

Section one of article eight of the constitution of the State ordains as follows: Corporations may be formed under general laws, but shall not be created by special act except in certain cases. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed.†

Provision is also made by the eighth section of the act defining the powers, privileges, and liabilities of corporations, that the charter of every corporation that shall hereafter be granted by the legislature shall be subject to altera-

---

* 3 Edm. Stats., 618, ?? 1–4.
† Constitution of 1846, Article 8, ? 1.

tion, suspension, and repeal, in the discretion of the legislature.*

Articles of association for the incorporation of railroad companies cannot be filed and recorded in the office of the secretary of state until at least one thousand dollars of stock for every mile of railroad proposed to be made is subscribed thereto, nor without complying with the other conditions specified in the second section of the general railroad act; and the first section of the act provides that such corporation shall be subject to the provisions (except those enacted in the seventh section) contained in title three of chapter eighteen of the first part of the revised statutes, which includes section eight, containing the reservation that the charter of every corporation that shall hereafter be granted shall be subject to alteration, suspension, and repeal, in the discretion of the legislature.† Such a reservation, therefore, is not only ordained by the constitution of the State but it has been twice enacted by the legislature, and it is conceded that both of those statutes are in full force. Superadded to those reservations is the further one, contained in the forty-eighth section of the general railroad act, which provides that the legislature may at any time annul or dissolve any corporation formed under this act, the effect of which, it is admitted by the defendants, is to incorporate into the grant a power of revocation, which seems to supersede all necessity for any further remark upon the subject.‡

Much consideration was given to the question under consideration in the case of *Dartmouth College* v. *Woodward*,§ in which the right of the State was denied to amend the charter granted to the college by the Crown before the Revolution, and to modify and restrict the same without the consent of the trustees under the charter. Four propositions were decided by the court in that case, the opinion being given by the Chief Justice: (1.) That the charter was a contract within the meaning of that clause of the Constitution which ordains that no State shall pass any law impairing the obligation of

---

* 1 Revised Statutes, 600.　　　† Session Acts 1850, 212, § 1.
‡ Ib. p. 234.　　　§ 4 Wheaton, 675.

contracts. (2.) That the charter was not dissolved by the Revolution. (3.) That the acts of the State legislature altering the charter, in a material respect, without the consent of the corporation, was an act impairing the obligation of the charter, and was unconstitutional and void. (4.) That the college, under its charter, was a private and not a public corporation.

Concurring opinions were also given by two of the associate justices, and Judge Story, in enforcing his views, remarked that where a private corporation is thus created by the charter of the Crown, it is subject to no other control on the part of the Crown than what is expressly or implicitly reserved by the charter itself. Unless a power be reserved for this purpose the Crown cannot, in virtue of its prerogative, alter or amend the charter or divest the corporation of any of its franchises, or add to them, or augment or diminish the number of trustees, or remove any of the members, or change or control the administration of the funds, or compel the corporators to receive a new charter.

Prior to that adjudication the Supreme Court of Massachusetts had decided that rights legally vested in a corporation cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation; and the learned judge having referred to that case remarked that the principles there laid down are so consonant with justice, sound policy, and legal reasoning, that it is difficult to resist the impression of their perfect correctness, showing very plainly that such legislation would be valid if the power for that purpose is reserved in the act incorporating the company.* Conclusive evidence that such was the opinion of that learned judge is also derived from his subsequent remarks in that same case, in which he says that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation or its corporate officers, or which restrains or controls the legitimate exercise of them,

---

* Dartmouth College v. Woodward Case, 4 Wheaton, 708; Wales v. Stetson, 2 Massachusetts, 146.

or transfers them to other persons, *without its assent*, is a violation of the obligations of the charter, adding: "If the legislature mean to claim such an authority it must be reserved in the grant."*

Where such a provision is incorporated in the charter, it is clear that it qualifies the grant, and that the subsequent exercise of that reserved power cannot be regarded as an act within the prohibition of the Constitution.†

Members of banking associations, it was enacted by the general banking law of New York, should not be individually liable for the debts of the association, unless it was so provided in the articles of organization, but this court held, in the case of *Sherman* v. *Smith*,‡ that a subsequent statute imposing such a liability upon the shareholders of the association was a valid law, as the charter reserved to the legislature the power to alter or repeal the act of incorporation. Such a conclusion was earnestly resisted at the bar, as the conditional exemption from such liability was embodied in the articles of association, but the court overruled the defence upon the ground that the reservation in the charter of the right to alter or repeal the act was paramount and controlling.

Decisions of the State courts, in repeated instances, both before and since that time, have been made to the same effect. When that case was before the Court of Appeals, before the record was removed here for revision, the Court of Appeals decided that the provision reserving to the legislature the power to alter or repeal the general banking law became a part of the contract with every association formed under it, and that the State might modify it prospectively or retrospectively without infringing the article of the Federal Constitution, which ordains that no State shall pass any law impairing the obligation of contracts, and this court affirmed the judgment in that case.§

---

* Dartmouth College *v.* Woodward, 4 Wheaton, 712; Cooley's Constitutional Limitations, 279.

† Pennsylvania College Cases, 13 Wallace, 213.          ‡ 1 Black, 587.

§ Oliver Lee & Co.'s Bank, 19 New York, 146.

Laws could not be enacted under the constitution in force when the general banking law was passed, to create, alter, continue, or renew any body politic or corporate, without the assent of two-thirds of the members in each branch of the legislature. Consequently it was contended that the members of such associations, subsequently created, could not be affected by the statute declaring that shareholders should be liable individually for the debts of the association, but the Court of Appeals reaffirmed the decision in the preceding case, and determined that the statute imposing that liability was a valid exercise of the power reserved in that act, and that its effect was that the franchises and privileges granted were at all times subject to abrogation or change by the legislative power of the State; that the power reserved was one to be exercised at any time by the existing legislative authority, however constituted, and in any mode conforming to the organic law of the State for the time being.*

Exactly the same principle was adopted in the case of *Railroad* v. *Dudley*,† where it was held that an alteration of the charter of the company, made by the legislature, in pursuance of the power reserved to alter or repeal the act, by changing its name, increasing its capital, *and extending its road*, did not discharge a subscriber to the stock from liability for his subscription, whether such alteration was or was not beneficial to him, the alteration having been duly made and without fraud on the part of the company.‡

Under such a reservation it is also held by the same court, that a member of the corporation holds his stock subject to such liability as may attach to him in consequence of an extension or renewal of the charter, made without his application or consent, and that the estate of an intestate succeeds to the individual liability imposed on the owner in his lifetime as a stockholder, in a corporation whose charter would

---

* The Reciprocity Bank, 22 New York, 14; White v. Railroad Co., 14 Barbour, 559.

† 14 New York, 348.

‡ See also Plankroad v. Thatcher, 11 New York, 110.

have expired if it had not been renewed, but was extended after his death; and that his administrator was liable for debts of the corporation contracted after the death of the intestate.*

Even the defendants admit that the exact question presented for decision in this case was decided by the Supreme Court of the State in the case between these same parties, or some of them, and which was subsequently transferred to the Court of Appeals, and was there reversed upon an exception involving a question of local law.†

Nearly forty years earlier the same question substantially was decided in the same way by the chancellor of that State, in which he held that where a State legislature reserves to itself, in the very charter it grants to a private corporation, the right of altering, amending, or repealing the act of incorporation, a subsequent repeal of the charter is valid and constitutional; that such a reservation in the charter of a corporation, upon common law principles, is not repugnant to the grant, but a constitutional limitation of the powers granted.‡ Few or none, it is presumed, will question the correctness of that rule, but the court here is of the opinion that the reservation is equally valid and effectual if it exists in the constitution of the State, or in a prior general law.§ So where the legislature in granting a charter to an insurance company reserved the right to alter it, and they subsequently exercised that right by declaring that if the assets of such corporation should pass into the hands of a receiver he might make assessments upon the premium notes, it was held that this was a legitimate exercise of the reserved power, and that it fully authorized the receiver to make assessments whenever it became necessary to carry the in-

---

* Bailey *v.* Hollister, 26 New York, 116; Clarke *v.* City of Rochester, 28 Id. 631; People *v.* Hills, 35 Id. 449.

† People *v.* Hills, 46 Barbour, 344.

‡ McLaren *v.* Pennington, 1 Paige Ch., 102.

§ Pennsylvania College Cases, 13 Wallace, 213; General Hospital *v.* Insurance Co., 4 Gray, 227; Roxbury *v.* Railroad Co., 6 Cushing, 424; Suydam *v.* Moore, 8 Barbour, 363; Angel & Ames on Corporations, 9th ed., § 767.

tention of the legislature into effect.\* Power to legislate, founded upon such a reservation in a charter to a private corporation, is certainly not without limit, and it may well be admitted that it cannot be exercised to take away or destroy rights acquired by virtue of such a charter, and which by a legitimate use of the powers granted have become vested in the corporation, but it may be safely affirmed that the reserved power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant or to secure the due administration of its affairs so as to protect the rights of the stockl olders and of creditors, and for the proper disposition of the assets.† Such a reservation, it is held, will not warrant the legislature in passing laws to change the control of an institution from one religious sect to another, or to divert the fund of the donors to any new use inconsistent with the intent and purpose of the charter, or to compel subscribers to the stock, whose subscription is conditional, to waive any of the conditions of their contract.‡

Attempt is made in this case to show that the right to elect all of the directors except four had become vested in the stockholders owning a minority of the shares, and that the amendatory act giving to the city the power to elect seven impairs that vested right, but the court is entirely of a different opinion, as the legislature in conceding that right made the concession subject to the reserved power to alter or repeal the charter, as ordained in the constitution of the State, and also in the several statutes mentioned, which clearly give to the legislature the power to augment or diminish the number or to change the apportionment as the ends of justice or the best interest of all concerned may require.

---

\* Hyatt *v.* McMahon, 25 Barbour, 467.

† Commonwealth *v.* Essex Co., 13 Gray, 253; Miller *v.* Railroad Co., 21 Barbour, 517.

‡ State *v.* Adams, 44 Missouri, 570; Zabriskie *v.* Railroad Co., 3 C. E. Green, 180; Railroad Co. *v.* Veazie, 39 Maine, 581; Sage *v.* Dillard, 15 B. Monroe, 357.

All parties supposed, when the charter was formed, and when the subscriptions to the stock were paid, that the capital stock would be eight hundred thousand dollars, and that the right conceded to the city to elect four out of the thirteen directors would give the city a fair proportion of the whole number, but circumstances have changed in consequence of the failure of a large class of the subscribers to the stock to make good their subscriptions. Payments being refused, the corporation found it necessary to reduce the capital stock, and to shorten the route, as before explained.

These changes from the original design made new legislation necessary to the ends of justice, and the amendatory act was passed to effect that object, and the court is of the opinion that the amendatory act is a valid law and that the judgment should be

AFFIRMED.

Mr. Justice BRADLEY, with whom concurred Mr. Justice FIELD, dissenting.

I dissent from the opinion of the court in this case, on the ground that the agreement with respect to the number of directors which the city of Rochester should elect, was not a part of the charter of the company, but an agreement outside of and collateral to it. Whilst the legislature may reserve the right to revoke or change its own grant of chartered rights, it cannot reserve a right to invalidate contracts between third parties; as that would enable it to reserve the right to impair the validity of all contracts, and thus evade the inhibition of the Constitution of the United States.