[No. 7,629.—In Bank.]
June 6, 1881.

# SPRING VALLEY WATER WORKS v. BOARD OF SUPERVISORS OF SAN FRANCISCO.

WATER COMPANIES—WATER RATES—CORPORATIONS.—The Spring Valley Water Company was organized under "An Act for the incorporation of Water Companies," passed April 22, 1858; by the provisions of which it had a right to have the water rates fixed by a Board of Commissioners; and the duty of appointing two of the Commissioners was imposed by the fourth section of the Act upon the Board of Supervisors. A Board of Commissioners was appointed under the Act; and, a vacancy having occurred in the Board by the death of one of the members appointed by the Board of Supervisors, the company applied for a writ of mandamus to compel the Board of Supervisors to appoint a new Commissioner.

*Held:* Section 4 of the Act in question was repealed by Section 1, Article xiv., of the Constitution, and the subject-matter is now governed by the Act of March 7, 1881.

ID.—ID.—ID.—CONSTITUTIONAL LAW—IMPAIRING THE OBLIGATION OF CONTRACTS.—The change in the law by the constitutional amendment of 1879, did not in any way impair the charter of the corporation, or interfere with any of its vested rights, and is not in conflict with any provision of the Constitution of the United States. (ROSS, J., dissents.)

APPLICATION for writ of mandamus.

*Fox & Kellogg* and *Newlands,* for Plaintiff.

*Rhodes & Barstow, John L. Murphy,* and *James A. Waymire,* for Defendant.

MCKEE, J.:

The Spring Valley Water Company was organized June 19, 1858, under an Act of the Legislature passed April 22, 1858. (Stat. 1858, p. 218.)

Object of its incorporation was, according to its certificate of incorporation, "to introduce into the City and County of San Francisco pure fresh water, for the purpose of furnishing it to the city and its inhabitants; and, in connection therewith, to transact all such business as might be necessary, proper and consistent with the laws and Constitution of the State of California."

In January, 1878—nearly twenty years after its incorporation— it seems to have availed itself of the provisions of Sec-

tion 4 of the Act of its incorporation, to appoint two Commissioners, who, with two others appointed by the Board of Supervisors of the city and county, selected a fifth, and these constituted a Board of Commissioners, whose duty it was, under the act of incorporation, to fix the rates to be charged by the company for water supplied to consumers. After its organization, the Board fixed a tariff of rates, to take effect June 1, 1878, and to remain in force for one year, and until new rates were established.

In July, 1878, a vacancy occurred in the Board by the death of one of its members, who had been appointed by the Board of Supervisors. The vacancy has never been filled, and now—nearly three years after the vacancy occurred—the company applies for a writ of mandate to compel the Board of Supervisors to appoint a new Commissioner.

Mandamus lies only when there is a clear legal right to have a specific thing done by a public tribunal, or officer, upon whom the law has imposed the duty of doing it. Under its charter the company had a right to have water rates fixed by a Board of Commissioners, and the duty of appointing two of them was imposed by the law upon the Board of Supervisors. But the law which imposed that duty was changed by Section 1 of Article xiv. of the Constitution, which provides that "the rates of compensation to be collected by any person, company, or corporation in this State, for the use of water supplied to any city and county or city or town, or the inhabitants thereof, shall be fixed annually, by the Board of Supervisors, or city and county, or city and town council, or other governing body of such city and county or city or town, by ordinance or otherwise, in the manner that other ordinances, or legislative acts or resolutions, are passed by such body; and shall continue in force for one year, and no longer." And by Section 1, Article xxii., of the Constitution it was ordained "that the provisions of all laws which are inconsistent with this Constitution shall cease upon the adoption thereof, except that all laws which are inconsistent with such provisions of the Constitution as require legislation to enforce them, shall remain in full force until July 1, 1880, unless sooner altered or repealed by the Legislature."

Section 1, Article xiv., of the Constitution has been en-

forced by appropriate legislation. It has, therefore, struck null that provision of Section 4 of the Act under which the company organized, for the appointment of Commissioners and the determination of water rates by the Board of such Commissioners. Water rates must be fixed by the Board of Supervisors, pursuant to the provisions of the Act of 1881 (Stat. 1881, p. 54), and not by a Board of Commissioners appointed under the Act of 1858, unless it be that the first section of Article xiv. of the Constitution contravenes the tenth section of Article i. of the Constitution of the United States, which prohibits a State from impairing the obligation of a contract; and that is the ground taken by the company.

The Act of 1858, under which the company organized, is its charter, and it may be conceded that the charter of a corporation, when accepted by the corporators, is a contract between them and the State, that the powers, privileges, and franchises granted shall not be restrained, controlled, or destroyed without their consent. (*Dartmouth College Case,* 4 Wheat. 709; *Pennsylvania College Cases,* 13 Wall. 190.) That must be so, unless it has been otherwise provided in the contract itself. But the company obtained its charter under a section of the Constitution of 1849 (Const. 1849, § 31, Art. xii.), which authorized the formation of corporations under general laws, and reserved to the State the power of altering such laws from time to time, or repealing them. As part of the organic law of the State, this provision entered into the contract between the company and the State, and when the corporation accepted the charter of the company, under the general law of 1858, they consented to take it subject to the exercise of the powers reserved to the State. As a creature of the State, it was bound by any laws passed by its creator in the exercise of powers, inherent or reserved. "But," as has been said by the Supreme Court of the United States, "the power of alteration and amendment is not without limit; the alterations must be reasonable; they must be made in good faith, and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong can not be inflicted under the guise of amendment or alteration. Beyond the sphere of the reserved powers, the vested rights of property of corporations, in such cases are surrounded by the

same sanctions, and are as inviolable as in other cases.    (*Shields
v. Ohio*, 95 U. S. 325.)

The question therefore remains, whether, in ordaining that
the Board of Supervisors shall annually fix the rate to be
charged by the company for water furnished to consumers,
the State has in any way impaired the charter of the corpo-
ration, or destroyed or impaired any vested right or property
acquired under it.

By the charter there was granted to the company the right
or franchise of distributing water through its pipes or mains
to any part of the city, and selling it to consumers at prices
to be fixed by public agents.    Assuming that non-interfer-
ence with the rights of the grant, or of property acquired
under it and the appointment of agents to establish the
rates between the company and the public, were obligations
which were binding upon the State, and that the company,
on its part, came under an obligation to furnish water to the
city of San Francisco, in case of great necessity, "free of
charge," and to the inhabitants thereof at prices to be estab-
lished by public agents, there was such a contract between
the company and the State as could not be violated by either
of the parties to it.    But it will be observed that neither the
power of fixing water rates, nor of appointing the agents for
that purpose, was granted to the company.    If it was
within the power of the State to delegate either of those
powers to a corporation or individual; it was not done by any
of the laws under which the company was incorporated.    A
privilege was given to the company to participate, to a cer-
tain extent, in the selection of the agents who were to con-
stitute the Board for determining the rates ; but the privilege
was subordinate to the powers reserved by the State for
regulating, between the corporation and the public, the
use of water furnished to the public by the appointment of
agents to fix the rate to be charged for it; and the company,
under its contract with the State held the privilege, subject
at all times to any laws which might be passed by the State
in the exercise of its powers of regulation and appointment.
Such powers were not granted to the company.    They could
not have been granted.    As governmental powers, it was not
in the power of the Legislature to bargain them away to cor-

porations or individuals. "Such powers," says Mr. Green-leaf, in his edition of ' Cruise on Real Property,' vol. 2, p. 67, " are intrusted to the Legislature to be exercised, not to be bartered away; and it is indispensable that each Legislature should assemble with the same measure of sovereign power which was held by its predecessors. Any act of the Legislature disabling itself from the future exercise of powers intrusted to it for the public good must be void, being in effect a covenant to desert its paramount duty of the whole people."

In exercising the powers of regulating the use of property of a corporation which has been devoted to public use, and the appointment of agents for the performance of a duty between the corporation and the public, the State may allow the corporation to participate in the selection of the agents, or it may select any of the corporators of the corporation to act in connection with other agents. But in so doing, it does it *ex mera gratia.* By making such appointments the State does not incur any obligation to continue them, nor does the mode of appointing agents. It may change the mode by which appointments shall be made. It may discharge at any time those who have been appointed, and appoint others in any mode it sees fit. The power of the State over its agents or officers is unlimited, except by constitutional limitations. In the absence of any constitutional prohibition, or affirmative provision, fixing the term of office of any officer, or his compensation, the Legislature may change such term or compensation even while the officer is in office. (*People ex rel. Dickinson* v. *Banvard,* 27 Cal. 470; *In re Bulger,* 45 id. 553.)

Changing the agents by which a thing is to be done, which a corporation is entitled to have done, does not interfere with the enjoyment of the right itself. The right still exists, and is recognized and protected by law, although a different agency may be appointed for the performance of the duty upon which the right rests. The change in the agency does not diminish the duty, nor impair the right. In the constitutional amendment there was, therefore, no diminution of the duty assumed by the State, and no interference with the rights of the company under its charter. A privilege of participating in the selection of agents for the performance of a public duty be-

tween it and the public has been taken away; but that privilege was in no sense a part of the contract between it and the State. The State was not under any obligation to continue it, or to make it co-existent with the grant of the charter. As a mere privilege, the company held it subject to the retained powers of the State, in the exercise of which, it was liable at any time, to be modified or annulled. By the constitutional amendment the State has annulled it; but in doing so, it has not interfered with the charter of the company, or disturbed any rights of property acquired under it, or obstructed the company in the enjoyment of any of those rights. The rights and duties of the company and of the State, arising out of the charter, are left intact and unimpaired. No property, tangible, or intangible, of the company has been interfered with. The water which it is engaged as a business in selling to the public is regarded and protected by law as its property; but, as property, which has been devoted to the use of the public, it is subject to the regulation and control of the State; and the State, while it has sanctioned the use, has a duty to discharge to the public by regulating the use, as well as the powers and privileges of the corporation incidental to the use. These things are not of the contract; they appertain to the sovereignty of the State, and can not be bargained away. "All property," says Mr. Chief Justice Waite, "which is affected with a public interest ceases to be a *juris privati* only, and becomes subject to regulation for public benefit; and property is affected with a public interest whenever it is devoted to such use as to make it of public consequence and to directly affect the community at large." (*Munn* v. *Illinois*, 94 U. S. 126.)

It is this use of property invested in a public business, and the powers and duties of a corporation incidental to it, which, in its relations to the public, are always subject to the regulation of the State. Every corporation, when it accepts its charter, consents to this regulation by the State; and the power of the State to regulate the use may be exercised to almost any extent to carry into effect the original purposes of the grant, and to protect the rights of the public and of the corporators, or to promote due administration of the affairs

of the corporation. (*Miller* v. *The State*, 15 Wall. 478; *Holyoke Water Co.* v. *Lyman*, id. 511.)

Whence it results, that when the State, by the constitutional amendment of 1879, took away from the petitioner the privilege of participating in the selection of public agents to perform the duty, under its charter, of fixing water rates between it and the public, it did not interfere with any of the vested rights of the company, and the exercise of its power in that respect can not be regarded as an unconstitutional act within the prohibition of the Federal Constitution.

The application of the petitioner is therefore denied.

SHARPSTEIN, J., concurred.

MYRICK, J., concurring:

I concur in the judgment. I also concur in the views of Mr. Justice McKEE, except as to what is said regarding the power of the State, independent of the provisions of the State Constitution, to restrain or control franchises granted to corporations, without their consent, and as to the grant of a franchise constituting a contract; upon these subjects I express no opinion.

THORNTON, J., concurring:

I concur in the judgment, and for the most part in what is said in the opinion of McKEE, J.; but I am of opinion that the right to change the mode of determining the rates to be charged for water furnished, remained in the Legislature, and was never alienated by the Act of 1858 or any other Act. The matter of fixing such rates is governmental, and formed no part of any contract with the (corporation) petitioner. The change therefore made by Section 1 of Article xiv. of the present Constitution, impaired no contract made with the corporation, and is not in conflict with any provision of the Constitution of the United States. The fixing of rates affects no right of property in or to the water furnished consumers. It takes no water from the corporation, and it deprives them of no right to sell water at fair rates. It is not to be presumed in advance, either as matter of law or fact, that the Board of Supervisors will not fix the rates as fairly and justly to all

parties as any Commissioners selected under and in accordance with the provisions of the fourth section of the Act of 1858. A just and fair determination is all that is required or desired by any person or either party to the litigation. The Board is not required to make other than equitable determination in the matter submitted to it. We can not perceive that it can be maintained, that any right of property of the corporation is, or can be, affected by the change made by the present Constitution of the State.

In coming to this conclusion, I lay out of view any retention of power to the Legislature, as expressed in Article iv. of the Constitution of 1849. In the view I take of the case, it is unnecessary to invoke that section to sustain the conclusion reached. It may, however, fortify such conclusion. The view here expressed, is in accordance with what is said in *Stone* v. *Mississippi,* 101 U. S. Rep. 814.

Ross, J., dissenting:

I dissent. In the recent case of *Stone* v. *Mississippi,* reported in 101 U. S., at page 814, Mr. Chief Justice Waite, delivering the unanimous opinion of the Supreme Court of the United States, declared, that "it is now too late to contend that any contract which a State actually enters into when granting a charter to a private corporation, is not within the protection of the clause in the Constitution of the United States that prohibits States from passing laws impairing the obligation of contracts. * * * In this connection, however (proceeds the Chief Justice), it is to be kept in mind that it is not the charter which is protected, but only any contract the charter may contain. If there is no contract, there is nothing in the grant on which the Constitution can act. Consequently, the first inquiry in this class of cases always is, whether a contract has in fact been entered into, and if so, what its obligations are. * * * The contracts which the Constitution protects are those that relate to property rights, not governmental. It is not always easy to tell on which side of the line which separates governmental from property rights a particular case is to be put; but in respect to lotteries (which was the case there under consideration) there can be no difficulty."

The language thus employed by the Court presents the principles which must govern the case before us in a clear light. The first inquiry for us, therefore, is, was there ever any contract between the Spring Valley Water Works and the State, and if so, what was its nature ? To determine this question we must look to the law under which the company was incorporated. It was organized on the nineteenth of June, 1858—its certificate of incorporation reciting that it was formed " under and in conformity with an Act of the Legislature of the State of California, entitled 'An Act to authorize George H. Ensign and other owners of the Spring Valley Water Works to lay down water pipes in the City and County of San Francisco,' passed April 23, 1858, and by virtue of an Act of the Legislature aforesaid, entitled 'An Act for the incorporation of water companies,' passed April 22, 1858, and in conformity with such other laws, or parts of laws, relating to the formation of corporations, as are now in force in said State of California." The certificate of incorporation further recites that " the object for which said company is formed, is the introduction of pure, fresh water into the City and County of San Francisco, and into any part thereof, from any point or points, place or places, for the purpose of supplying the inhabitants of said city and county with the same, and to do and transact all such business relating thereto as may be necessary and proper; not, however, to be inconsistent with the laws and Constitution of the State of California."

It is not necessary to make further mention of the Ensign Act, for the reason that it was void, as was held in *San Francisco* v. *S. V. W. W.*, 48 Cal. 493.

The Act of April 22, 1858, although entitled "An Act for the incorporation of water companies," in reality contained within itself no provisions for the incorporation of any company. Its first section provided that the provisions of the Act of April 14, 1853, for the formation of corporations for certain purposes, and the provisions of the amendatory Act of April 30, 1855, " shall extend to all corporations already formed, or hereafter to be formed, *under said acts* (that is the Acts of 1853 and 1855), for the purpose of supplying any city and county, or any cities or towns in this State, or the

inhabitants thereof, with pure, fresh water." The remaining sections of the Act of April 22, 1858, except the last, relate to certain rights and privileges conferred, and to certain obligations imposed on any company incorporated for the purposes specified in the first section; and the last section of the Act is in these words: "Any incorporation heretofore formed for the purposes specified in this Act, shall have the right to reincorporate under the provisions of this Act, without losing, forfeiting, or diminishing any of the rights, privileges, franchises, or immunities which they have heretofore lawfully acquired."

While the section of the Act of April 22, 1858, just quoted, as well as its title, indicates that it was supposed by the Legislature that provisions were therein made for incorporations under it, it will appear from the Act itself, the substance of which I have already stated, that there are no such provisions. Nevertheless this Act must be read in connection with those to which it refers, namely, that of April 14, 1853, and the amendatory Act of April 30, 1855, and as a part of the law for the formation of water companies; and while the Spring Valley Water Works had to look to the Act of 1853 for the machinery by which to incorporate, it was subject to the burdens imposed, and entitled to the rights and privileges granted by the Act of April 22, 1858.

Through and by means of that Act the Legislature of the State said to all of its people, that all corporations formed under its laws for the purpose of supplying any city and county, or any cities or towns in the State, or the inhabitants thereof, with pure, fresh water, should be entitled to all of the rights and privileges, and be subject to all of the duties and obligations therein prescribed. Among those rights and privileges was given the power to acquire by condemnation property necessary for the use of such corporarations, and the right, subject to the reasonable direction of the Board of Supervisors or city or town authorities, as to the mode and manner of exercising such right, to use so much of the streets, ways, and alleys in any town, city, or city and county, or on any public road therein, as should be necessary for laying pipes for conducting water, etc.

The fourth section, which is the one most material to be

considered in this case, provided: "All corporations formed
under the provisions of this Act, or claiming any of the priv-
ileges of the same, shall furnish pure, fresh water to the in-
habitants of such city and county, or city and town, for family
uses so long as the supply permits, at reasonable rates and
without distinction of persons, upon proper demand therefor,
and shall furnish water to the extent of their means, to such
city and county, or city or town, in case of fire or other great
necessity, free of charge. And the rates to be charged for
water shall be determined by a Board of Commissioners, to
be selected as follows: Two by such city and county or city
or town authorities, and two by the Water Company; and in
case that four can not agree to the valuation, then, in that
case, the four shall choose a fifth person, and he shall become
a member of said Board; if the four Commissioners can not
agree upon a fifth, then the Sheriff of the county shall appoint
such fifth person. The decision of a majority of said Board
shall determine the rates to be charged for water for one
year, and until new rates shall be established. The Board of
Supervisors, or the proper city or town authorities, may pre-
scribe such other proper rules relating to the delivery of water
not inconsistent with this Act and the laws and Constitution
of this State."

By incorporating and availing itself of the privileges of this
Act, the Spring Valley Water Company became bound, among
other things, to furnish water, to the extent of its means, to
the City and County of San Francisco, in case of fire or other
great necessity, free of charge, and it has already been deter-
mined by this Court that the words "other great necessity"
include all water necessary for sprinkling streets, watering
public squares and parks, for flushing sewers, and for all like
purposes beneficial to the public. But why was the company
bound to furnish its water for such purposes free of charge?
Simply because by accepting the offer held out by the Act of
1858, and incorporating and availing itself of its privileges, it
agreed—*contracted*—to do so, and was bound by the terms of
the contract. By the exercise of no governmental power of
which I am aware could the Spring Valley Water Works be
compelled to furnish the City and County of San Francisco
with water, free of charge, for any purpose. That obligation

could, and did, only arise out of the contract. But the con-
tract did not end there; for by it the company also bound
itself, and became entitled, to furnish pure, fresh water to
such of the inhabitants of the city and county as should wish
to take it, so long as the supply should permit, for family
uses, at reasonable rates and without distinction of persons,
upon proper demand therefor—the rates to be charged for
water so furnished to be fixed, however, in the manner speci-
fied in the Act. This right was a part, and the principal part,
of the consideration the company received for its agreement to
furnish the city and county with water for the purposes
mentioned, free of charge.

The manner of fixing the rates was as much a part of the
agreement between the company and the State as was the agree-
ment to furnish the public water for certain purposes free of
charge. Both, as I understand it, rested upon contract, and
upon contract alone—the one as much as the other, and both
relating to property rights—to the terms upon which the
company should sell and dispose of the water it owned.

But it is said that the manner of fixing the rates to be
charged by the company for water furnished the inhabitants
of the city and county, prescribed by the Act of 1858, has
been changed by Section 1 of Article xiv., of the new Con-
stitution, which is in these words:

"The use of all water now appropriated, or that may be
hereafter appropriated, for sale, rental, or distribution, is
hereby declared to be a public use, and subject to the control
of the State, in the manner prescribed by law; provided, that
the rates or compensation to be collected by any person,
company or corporation in this State for the use of water
supplied to any city and county, or city or town, or the in-
habitants thereof, shall be fixed annually by the Board of
Supervisors, or City and County, or City or Town Council,
or other governing body of such city and county, or city or
town, by ordinance or otherwise, in the manner that other
ordinances or legislative acts or resolutions are passed by
such body, and shall continue in force for one year, and no
longer. Such ordinances or resolutions shall be passed in the
month of February of each year, and shall take effect on the
first day of July thereafter. Any Board or body failing to

pass the necessary ordinances or resolutions fixing water rates where necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such other processes and penalties as the Legislature may prescribe.   Any person, company or corporation collecting water rates in any city and county or city or town in this State, or otherwise than as so established, shall forfeit the franchise and water works of such person, company, or corporation to the city and county, or city or town, where the same are collected for public use."

If, as is said in the prevailing opinion, the provisions of this section of the new Constitution have struck null the provisions of the Act of 1858, relating to the fixing of the rates to be charged for water furnished the inhabitants of the city and county, I am unable to see why it has not also struck null those provisions of that Act requiring the company to furnish the city and county with water, for the purposes therein mentioned, *free of charge*.   The one is as much a part of the contract between the State and the company as the other.   If there was a contract between the State and the company at all (and I understood the prevailing opinion to proceed upon the theory that there was), I know of no ground for saying that the clause relating to the fixing of rates to be charged for the water furnished by the company to the inhabitants of the city and county was not a part of that contract.   In my opinion it was a most material part of it, providing as it did for fixing the amount of money the company should receive for its water.

If the above cited provision of the new Constitution affects this contract at all, I see no escape from the conclusion that the Spring Valley Company is thereby relieved from the necessity of furnishing the city and county with any water, for any purpose, free of charge; because if the contract relating to the furnishing of water by the company is vitiated in part, it is vitiated altogether, and because the Constitution declares, "that the rates or compensation to be collected by any person, company, or corporation in this State for the use of water supplied to any city and county, or city or town, or to the inhabitants thereof, shall be fixed, annually, by the Board of

Supervisors, or city and county, or city and town council, or other governing body of such city and county, or city or town, by ordinance or otherwise, in the manner that other ordinances, or legislative acts, or resolutions are passed by such body, and shall continue in force for one year and no longer." There is in this provision no exception of any character, but its language is general and sweeping. In my opinion, however, this provision of the Constitution does not in any way affect the contract by which the Spring Valley Water Works bound itself to furnish the City and County of San Francisco with water for certain purposes, free of charge, and by which it became entitled to have the rates to be charged for water furnished the inhabitants of the city and county fixed as prescribed in the Act of 1858, for the reason that it is one of those relating to property rights—to the amount the company should be paid for the property it owned—and therefore comes within the protection of that clause of the Constitution of the United States that prohibits States from passing laws impairing the obligation of contracts. The ground upon which it is sought to make the provisions of the present Constitution apply to, and consequently control, the provisions of the Act of 1858 in the particular mentioned, is, that at the time that Act was adopted, and at the time the Spring Valley Water Works incorporated, there was a provision in the then existing Constitution providing that: "Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time, or repealed," and that by reason of the power thus reserved to the State, it was competent for the law-making power to alter, amend, or repeal the provision in question here.

No one, I presume, will dispute the general proposition, that the charter of a corporation is subject to the reserved power in the State to alter, or amend, or repeal at any time any of its provisions, subject to the limitation, however, that such alteration or amendment must be reasonable, and consistent with the scope and object of the Act of incorporation (*Shields* v. *Ohio*, 95 U. S. 325 ; Sinking Fund Cases, 99 U. S., 720), nor the proposition that any one Legislature can not irrev-

ocably bargain away any of its governmental powers, such, for example, as the right of eminent domain provided for in the second section of the Act of 1858. On the other hand, it is just as clear that the Legislature may contract with a private corporation concerning the property of such corporation, and that such a contract may be contained in the charter of the corporation, and when made becomes a vested right and beyond the reach of subsequent legislation. (*Stone* v. *Mississippi*, 101 U. S. 817, 820; Cooley's Const. Lim., 4th ed., p. 347; *Commonwealth* v. *Essex Co.*, 13 Gray, 253; *Sage* v. *Dillard*, 15 B. Mon. (Ky.) 349.) Of this latter character, in my opinion, was the contract before us in the present case. Therefore, in my view, it becomes unnecessary to inquire whether a charge in the provision of the Act of 1850, securing to the water company reasonable rates for water furnished the inhabitants of the city and county, to be fixed by a commission, in the appointment of which the company should have a voice, to such rates as the "Board of Supervisors, * * * or other governing body of such city and county," should fix (without limitation or qualification), and coupled with the condition, that if the company should collect any water rates otherwise than as so established, it should forfeit its franchise and water works—its reservoirs, and pipes, and water—to the city and county, for the use of the public, would be a reasonable amendment to the law, and so permissible under the reserved power of the State. It seems to me it would be stretching the reserved power almost, if not quite, beyond limit, if this can be done. However, it is not necessary, in my view of the case, to express any opinion upon that question. For the reasons already stated, I am constrained to dissent from the judgment of my associates.

I think the petitioner entitled to the writ prayed for, and that it ought to be granted.