### YOAKAM v. PROVIDENCE BILTMORE HOTEL CO. et al.

District Court, D. Rhode Island. August 12, 1929.

No. 312.

Herbert M. Sherwood and Sidney Clifford, both of Providence, R. I., for complainant.

Edward P. Jastram, Elliot G. Parkhurst, John S. Dole, and Edwards & Angell, all of Providence, R. I., for respondents.

LETTS, District Judge. This action was brought to restrain the respondent corporation from putting into effect a plan of corporate reorganization, embodied in several amendments to its charter, and from assuming and paying the expenses of the reorganization committee.

The case also involves a consideration of how far the Legislature of the state of Delaware may, under the reserved power in its General Corporation Law in effect when the respondent was incorporated, confer by subsequent enactment upon the majority of stockholders the power to adopt charter amendments which will be binding upon a dissenting minority. There are involved no rights of creditors, no problem for the raising of needed new capital.

The Providence Biltmore Hotel Company was organized under the General Corporation Law of the state of Delaware on June 10, 1920. Under the terms of the certificate of incorporation it is given broad powers to carry on any business incident or advantageous to owning and operating hotels in the state of Rhode Island. Actually, the corporation was created for the purpose of building, owning, and operating the Biltmore Hotel in the city of Providence.

In the course of the completion and equipment of the hotel the following indebtedness was created and securities issued:

| | |
|---|---|
| Mortgage secured debt | $1,900,000 |
| First preferred stock 7 per cent. cumulative, par $100 | 24,981 shares |
| Second preferred stock 7 per cent. cumulative, par $100 | 10,000 shares |
| Common stock, no par | 10,000 shares |

Through the application of two separate sinking funds authorized in the certificate of incorporation, one of said funds being provided for the reduction of the mortgage indebtedness and the other for the retirement of outstanding first preferred stock, the capital structure of the respondent on December 31, 1928, and as of the time when the charter amendments here involved were adopted, was as follows:

| | |
|---|---|
| Mortgage secured indebtedness | $1,615,000 |
| First preferred stock outstanding | 22,475 shares |
| Second preferred stock outstanding | 10,000 shares |
| Common stock outstanding | 10,000 shares |

The complainant is the owner of 270 shares of first preferred stock. Solely in respect to his rights as such holder is this bill brought.

The certificate of incorporation, in respect to the first preferred stock, embodied, prior to the adoption of the amendments here opposed, the following provisions:

First. The payment of a yearly dividend of 7 per cent., payable quarterly from the surplus or net profits of the corporation, which dividend is cumulative and payable before any dividend can be paid upon the second preferred or common stock.

Second. The first preferred stock may be redeemed upon 60 days' notice, in which event, or in event of liquidation, the holder thereof is entitled to receive $110 per share.

Third. The corporation shall, on or before the last day of each year, beginning with the last day of the year 1922, make fixed payments of $20,000 into a sinking fund, to be deposited in the Rhode Island Hospital Trust Company, to be used by it each year to purchase or redeem outstanding preferred stock. All stock so purchased or redeemed in the application of this fund is to be canceled and not again reissued.

Fourth. The first preferred stock is given the right to elect two directors, which right may not be altered without unanimous consent. This stock is given the further right of assuming the exclusive voting control of the corporation, in event the annual sinking fund be not set aside and/or in event the dividends thereon shall be in arrears 1½ years. This right to take over the management of the corporation continues so long as such failure or default exists. In the absence of such failure in either of said respects, the first preferred stock has no vote, other than for the election of two directors.

Fifth. Paragraph fifth of the certificate (excepting a mortgage secured indebtedness not in excess of $2,000,000) provides as follows:

"Fifth. (a) This corporation, except as herein provided, shall not without the consent in writing of the holders of record of seventy-five per cent. (75%) in amount of the outstanding first preferred stock or without the consent of seventy-five per cent. (75%) in amount given by vote at a meeting of the first preferred stockholders duly called

and held for the purpose, (a) increase the amount of the first preferred stock authorized by this certificate, (b) nor mortgage, pledge or create any lien upon any real estate or interest therein or leases or leaseholds, fixtures, furnishings or equipment owned by it, (c) issue or guarantee any obligations having a longer maturity than one year or incur any obligations for money borrowed maturing later than one year from the incurring thereof, (d) *change any voting powers of any class of capital stock,* (e) change the purposes for which the corporation is formed or the nature of the business to be transacted by it, (f) *create any issue of stock in any respect prior to or on a parity with the aforesaid issue of said first preferred stock* (g) dispose by sale, lease, exchange, consolidation, merger or otherwise of all or the major part of its property or business: * * *"

The aforementioned provisions of respondent's charter remained unchanged until December 31, 1928. The certificate is silent in respect to conferring upon the first preferred stockholders pre-emptive rights to subscribe to new issues of stock.

The Providence Biltmore Hotel was completed and started operation in July of 1922. In no year has the net income of the corporation been sufficient to meet current dividend requirements upon the first preferred stock. It does appear, however, that between 1922, when the hotel was operated at a loss of more than $60,000, to the close of the year of 1928, substantial progress has been made. During the latter year the hotel was operated at a net profit of $85,721.11. During this period the corporation operated without financial embarrassment, other than to its stockholders, and has accumulated a substantial earned surplus. It has no present need of raising additional capital. As of December 31, 1928, there was cash on hand amounting to $417,-639.94 and accounts payable in the sum of $6,210.25. The real estate and personal property appertaining to the hotel have been maintained, as well as adequate depreciations written off. All requirements in respect to the sinking fund for the reduction of the mortgage indebtedness, as well as that for the retirement of first preferred stock, have been punctually met.

During this period there have, however, accumulated unpaid dividends upon the first preferred stock of $42 per share, amounting to approximately $943,950. There have also accumulated dividends upon the second preferred stock amounting to $45.50 per share, aggregating $455,000.

The Providence Chamber of Commerce originally sponsored in part the organization of the corporation. It also assisted in the sale of its first preferred stock, and otherwise aided in raising the necessary capital to build and equip the hotel. Presumably because of this interest in the affairs of the corporation, and because of the nonpayment of dividends upon the stock which had been sold, the president of the Chamber in 1927 appointed a committee, consisting of holders of first preferred stock, to consider the advisability of recommending a reorganization of the corporation's capital structure. The committee, through personal ownership by its members and the ownership by corporations which they individually represented, owned 1,629 shares, or approximately 5 per cent., of the total first preferred stock outstanding. The first preferred stock is widely distributed, there being some 1,500 holders. Approximately 26 per cent. of the total is, however held by Messrs. John McE. Bowman and Lou C. Wallick, president and vice president, respectively, of the corporation. They also own all the outstanding second preferred stock and more than 80 per cent. of all outstanding common stock.

Point was made in the complainant's argument and brief of the advantages to Messrs. Bowman and Wallick from the adoption of the plan of reorganization, by virtue of their predominating ownership of the junior securities. It is agreed, however, that they did not originate the plan. There is no basis for finding actual or constructive fraud in this controversy; in fact, the high standing in the community of each individual member of the reorganization committee is sufficient assurance that the proposed plan is free from any intentional unfairness. The case involves only an analysis and definition of legal rights.

Under date of March 2, 1928, the committee submitted a report designated as "Plan and Agreement of Recapitalization of Providence Biltmore Hotel Company." The plan provided for the deposit of certificates of first preferred stock with the Rhode Island Hospital Trust Company as depositary, to be voted by the committee for the approval or rejection of the plan.

In November, 1928, the proposed plan of reorganization, with some minor alterations, was approved by the directors. These directors had been elected by the holders of common stock, as the holders of the first preferred had never exercised their right to take over the management of the corporation.

Thereafter, on December 27, 1928, at a meeting of the stockholders, approximately

82 per cent. of the outstanding first preferred stock was voted by the committee in approval of the necessary amendments to the certificate of incorporation to carry the plan into effect. There was also voted by the committee, in approval thereof, pursuant to the terms of an agreement with Messrs. Bowman and Wallick, all of the second preferred stock. The committee likewise voted in approval, holding proxies therefor, 8,174 shares of common stock owned by Messrs. Bowman and Wallick. The stock owned by the complainant was voted in opposition to all of the proposed changes.

The amendments adopted provide for:

(1) The creation of a prior preferred class A stock, with a par value of $50 and cumulative 7 per cent. dividends thereon;

(2) The creation of a prior preferred class B stock, having a par value of $50, with a dividend of 5 per cent., cumulative as follows:

$1.00 per share during 1929;

$1.50 per share during 1930;

Fully cumulative at $2.50 per share during 1931 and thereafter;

(3) For the issuance of not exceeding 42,-475 additional shares of no par common stock.

The holder of first preferred stock may exchange the same as follows:

For each share of first preferred he will receive one share of prior preferred class A, one share of prior preferred class B, and one-half share of common, with a further right to subscribe for an additional one-half share of common at $20 per share, which right, if not exercised, expires December 31, 1932.

As a condition to making such exchange, however, the first preferred stockholder must waive all rights to accrued and unpaid dividends upon his stock.

As a part of the plan of recapitalization it has been agreed with Messrs. Bowman and Wallick that they exchange all of the outstanding second preferred stock for 20,000 shares of the additional common, and on their part waive all accrued and unpaid dividends upon the second preferred.

It is urged by respondent that the exchange of the first preferred stock for the securities described is permissive, not compulsory. This interpretation, however, cannot be taken seriously. The circumstances created in the plan here presented, irrespective of the language employed, amount to compulsion. The exchange is in law compulsory, if to refrain therefrom would result in an obvious and substantial loss. The circumstances created to induce or compel the exchange of all first preferred stock for the securities described are the result of provisions incorporated in the amendments. They are as follows:

First. After December 31, 1928, the dividends upon the first preferred stock are no longer to be cumulative.

Second. All voting rights are taken from the first preferred stock, except the right to elect two of nine directors.

Third. The annual sinking fund of $20,-000 for the retirement of this stock is for the future abolished.

Fourth. An added amendment, no counterpart of which appears in the original certificate of incorporation, would exclude remaining holders of first preferred from subscribing as of right to new issues of securities.

In other words, if the holder of first preferred stock were to elect not to make the exchange, he would be left with a stock still called first preferred, but stripped of nearly every characteristic which gave it value. The outstanding shares would no longer be annually reduced through purchase or redemption from the sinking fund. The dividends thereon would no longer be cumulative, and the stock would be shorn of any effective voice in the management of the affairs of the corporation.

To this plan in its entirety the complainant objects. He asks that the charter amendments effectuating the same be held to be void, and the respondent restrained from acting thereunder. The complainant further excepts to the action of the board of directors in voting to assume and pay the expenses of the committee in formulating and carrying out the reorganization plan recommended.

The case narrows itself to substantially the following issues:

A. Is the corporation legally justified in assuming and paying the expenses of the reorganization committee?

B. (1) Is the amendment denying to the holders of first preferred stock the right to subscribe to new issues valid?

(2) Is the amendment making the dividend upon the first preferred stock, after December 31, 1928, no longer cumulative, objectionable?

(3) Is the amendment creating the two classes of preferred stock having priority over the first preferred invalid?

(4) Is the amendment valid which abolishes all voting rights on the part of the first preferred stock other than for the two directors (a) as it relates to the exercise of that right in event dividends are in arrears

for 1½ years; (b) as it relates to the exercise of that right in event of failure to meet the requirements of the annual sinking fund for the retirement of first preferred stock?

(5) Is the amendment invalid which would abolish the annual sinking fund for the purchase or redemption of first preferred stock?

These issues will be resolved in the order stated:

The action of the directors in assuming the expenses of the reorganization committee was ratified by a vote of the stockholders. No showing has been attempted that the amount of the expenses is excessive. The objection of the complainant is predicated upon the contention that the plan of reorganization is not for the benefit of the corporation, and that the funds of the corporation should not therefore be used to pay the expenses of the committee, unless, as is suggested, the expenses of the complainant in this litigation also be paid.

The test of the propriety of assuming this expense is, not whether the plan as consummated is valid in all respects and beneficial to the corporation, but whether the action of the directors was reasonably within the scope of their authority in dealing with matters relating to corporate management and corporate interests. The corporation in the case at bar was confronted with a situation pertaining to its capital structure which would have warranted the directors in authorizing a study to be made as to the possibility of evolving a plan to eliminate or recapitalize in some manner the large accrual of unpaid dividends upon its outstanding preferred stocks. The committee which undertook this study, while in the first instance appointed by an outside agency, appears to have worked in close harmony and accord with the officers of the corporation. It was that sort of an undertaking which the directors in the first instance might reasonably have initiated. That which they could have authorized, they, as directors, could by adoption ratify. This, of course, is predicated upon the assumption of both the reasonableness and good faith of the committee's efforts and the justification for the study made, although the resulting recommendations may in law be ill-conceived and wholly abortive.

The courts may not intrude in the management of a corporation to the extent of passing upon the wisdom of actions taken, if the subject-matter dealt with is within the scope of corporate authority, is within the realm of the business management of the corporation. In this instance there was a

sufficient corporate interest, as distinguished from the personal interests of the individual stockholders, to justify the directors in assuming and paying the expenses incurred. Rascovor v. American Linseed Co. (C. C. A.) 135 F. 341.

It is also doubtful if the complainant can, in this action, combine in the form of averments presented a claim essentially on behalf of the corporation with others which are distinctly individual and against the corporation. Delaware & H. Co. v. Albany & S. R. Co., 213 U. S. 435, 445, 29 S. Ct. 540, 53 L. Ed. 862; Legg & Co. v. Dewing, 25 R. I. 568, 569, 57 A. 373; 14 Corpus Juris, 943 et seq.

It is not, however, necessary to here pass upon that question, as this court has no hesitancy in holding that the assumption of the committee's expense was entirely proper.

The next issue presented is that relating to the amendment denying all pre-emptive rights to the first preferred stock.

Paragraph tenth of section 5 of the General Corporation Law of the state of Delaware, chapter 65, Revised Code 1915 (section 1919), as now amended (35 Del. Laws, c. 85, § 4), provides:

"The certificate of incorporation may also contain such provisions as may be desired limiting or denying to the stockholders the pre-emptive right to subscribe to any or all additional issues of stock of the corporation of any or all classes."

Acting pursuant to this provision of the statute, the following amendment to the certificate of incorporation was adopted, the same being added as article ninth thereof:

"Ninth. Except as provided in article fourth hereof, no stockholder shall be entitled as of right to subscribe for, purchase or receive any unissued stock of any class now or hereafter authorized, or of any bonds, notes, debentures or other securities convertible into or representing the right to purchase stock of any class now or hereafter authorized."

The General Corporation Law of Delaware as it existed at the time the respondent was incorporated contained no provision in regard to the pre-emptive rights of stockholders, nor did the original certificate make reference thereto.

The so-called right of pre-emption is not, except within narrow and defined limits, an absolute rule of law. It had its origin in the days of simple corporate structures; that is, during the period when it was usual for a corporation to have but one class of stock. The doctrine is one developed by judicial decisions to the end of protecting stockholders

in their relative voice or proportionate interest in the assets and control of the enterprise involved. The right has never been consistently extended to nonvoting stocks, or to nonparticipating preferred stocks having but a special and limited voting right. Justice will be best served, under present-day conditions, by disregarding in this connection legal dogma, and by asserting an equity jurisdiction to hold, in respect to the facts of each case, directors and majority stockholders to a high standard of reasonableness and fairness in issuing new shares.

In the case at bar there is no invasion or denial of complainant's rights by virtue of incorporating the proposed amendment in the respondent's charter. There is no present proposal to issue additional shares of first preferred stock. The right to subscribe to such shares, under the facts here presented, would be the most that could be claimed as a pre-emptive right. That which may be done in the future is not now before us. The validity of this amendment, as such, will therefore not now be passed upon, but complainant's prayer, contained in his bill of complaint in respect thereto, will be denied. ▇ The following issues, to avoid unnecessary repetition and duplication of references, will be discussed together. Their determination involves in part an examination of the same material.

These issues are the validity of the charter amendments creating the classes of prior preferred stock, abolishing the cumulative feature of the dividends and the right, upon the happening of certain conditions, to assume the voting control of the corporation. These revisions will be considered in the light of the provisions of the original certificate of incorporation and the Corporation Law of Delaware as it existed at the time the respondent was incorporated.

It is unnecessary in this connection to cope with the troublesome question of how far the subsequent amendments to the Delaware statute are applicable and effective by virtue of the power reserved by the Legislature.

Section 13 of the General Corporation Law of the state of Delaware, chapter 65, Revised Code of 1915 (section 1927), as amended (29 Del. Laws, c. 113, § 7) and in force in 1920, provided as follows:

"Sec. 13. *Kinds of Stock; Preferred Stock.*—Every corporation shall have power to create two or more classes of stock, with such designations, preferences and voting powers, or restrictions or qualifications thereof, as shall be stated and expressed in the certificate of incorporation; and the power to increase or decrease the stock, as in this act elsewhere provided, shall apply to any or all of the classes of stock. Any or all classes of preferred stock may, if desired, be made subject to redemption at such time or times, and at such price, not less than par, as may be expressed in the certificate of incorporation or an amendment thereof; and the holders of any preferred stock shall be entitled to receive and the corporation shall be bound to pay thereon dividends at such rates and on such conditions as shall be stated in the certificate of incorporation, or an amendment thereof, payable quarterly, half-yearly or yearly, before any dividends shall be set apart or paid on the common stock; and when any such quarterly, half-yearly or yearly preferred dividend shall have been paid or set aside as herein provided, a dividend upon the common stock may then be paid out of the remaining surplus or net profits of the company; and such preferred dividends may be made cumulative; and in no event shall a holder of preferred stock be personally liable for the debts of the corporation; but in case of insolvency, its debts or other liabilities shall be paid in preference to the preferred stock. Unless its original or amended charter or certificate of incorporation shall so provide, no corporation shall create preferred stock. The terms 'general stock' and 'common stock' are synonymous."

Section 26 of the General Corporation Law of the state of Delaware, chapter 65, Revised Code 1915 (section 1940), as amended (29 Del. Laws, c. 113, § 12), in force in 1920, provides in part as follows:

"Sec. 26. *Charter How Amended; When Corporation Has Capital Stock; When Corporation Has No Capital Stock.*—Any corporation of this State existing prior to the tenth day of March, 1899, whether created by special Act, or general law, or any corporation created under the provisions of this Chapter, may, from time to time, when and as desired, amend its charter of incorporation, either by addition to its corporate powers and purposes, or diminution thereof; or by substitution of other powers and purposes, in whole or in part, for those prescribed by its charter; or by increasing or decreasing its authorized capital stock; or by changing the number and par value of the shares of its capital stock; or by changing its corporate title; *or by making any other change or alteration in its Charter of incorporation that may be desired;* provided that such amendment, change or alteration shall contain only such provisions as it would be

lawful and proper to insert in an original certificate of incorporation made at the time of making such amendment.

"* * * *  *Provided, however, that if any such proposed amendment would alter or change the preferences given to any one or more classes of preferred stock,* authorized by the certificate of incorporation, or would increase or decrease the amount of the authorized stock of such class or classes of preferred stock, or would increase or decrease the par value thereof, then the holders of the stock of each class of preferred stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the certificate of incorporation such class be entitled to vote or not; and the affirmative vote of a majority in interest of each such class of preferred stock so affected by the amendment shall be necessary to the adoption thereof, in addition to the affirmative vote of a majority of every other class of stock entitled to vote thereon, but the certificate of incorporation may contain provisions requiring the *affirmative vote of a larger proportion of such preferred stock for the adoption of such amendment.*"

When the respondent was incorporated in 1920 and acting pursuant to the authority and suggestion of the last-quoted provision of the Delaware statute, paragraph fifth of its certificate of incorporation embodied the provision already quoted in this opinion. The provisions of significance in this connection are as follows:

"Fifth. (a) This corporation, *except as herein provided,* shall not * * * without the consent of seventy-five per cent. (75%) in amount given by vote at a meeting of the first preferred stockholders duly called and held for the purpose, * * * (d) change any voting powers of any class of capital stock, (f) create any issue of stock in any respect prior to or on a parity with the aforesaid issue of said first preferred stock."

Section 26, quoted above, embodies a general authority to amend in any respect desired, provided the intent and purpose of such amendment would have been lawful and proper to insert in the original certificate. Such general authority would probably be insufficient to justify an amendment of a fundamental character not specifically provided for elsewhere in the statute or in the original charter. In this instance, however, the same section of the statute makes specific provision for amendments which would alter the preference rights of preferred stock and requires that to effect such an amendment

the preferred stock may vote as a class and that a majority vote in approval thereof must be given.

Section 13 of the same statute recognized also the propriety of having dividends upon preferred stock, either cumulative or noncumulative.

No case has been cited, and none have been found, which held that the right to have dividends upon preferred stock cumulative is not a preference right. If there be unanimity of authority upon any point here involved, it is upon that question. The right to have dividends cumulative being a preference right, and the right to alter preferences being specifically provided for in the statute under which respondent was incorporated, there can be no serious question raised as to the propriety of the amendments here involved to that extent.

Related to the provision which would abolish cumulative dividends upon the first preferred stock for the future is another provision in respect to which the position of this court should be clear. This provision is embodied in the latter part of the same paragraph fourth (c). It is as follows:

"Failure to declare and set apart or pay any dividend or dividends in the full amount of seven dollars ($7.00) per share upon the first preferred stock in any calendar year after this amended article fourth shall have become effective, although there was surplus and net earnings or profits available in such year for dividends upon the first preferred stock, shall not prevent the payment of dividends upon the common stock in any subsequent calendar year if dividends upon the first preferred stock in the amount of seven dollars ($7.00) per share are declared and set apart or paid in such subsequent calendar year, and if all cumulative dividends accrued on such first preferred stock shall have been paid."

This provision was obviously inserted to circumvent the doctrine laid down in the case of Barclay et al. v. Wabash Ry. Co. et al. (C. C. A.) 30 F.(2d) 260, and the line of cases cited in Judge Manton's opinion in that case. While it is apparent that there is now before the court no issue arising under this provision of the charter amendment, it seems advisable to expressly indicate that we are not now approving of that provision, and to avoid future controversies to suggest that the purpose of this provision is probably ill-conceived.

When the respondent incorporated, there was inserted paragraph fifth (a), already referred to, in its original charter.

The provisions there included were proper under the general authority to amend as contained in section 26 of the statute. This provision of the charter specifically refers to amendments that would change the voting powers of any class of capital stock, and those that would create issues of stock having priority to the first preferred stock. It has been urged that this provision of the charter is restrictive only, and does not embrace an affirmative consent to amend in the respects mentioned. It is urged, also, that the statute makes no specific provision for amendments which would alter voting powers or create prior issues of stock. It is true that the statute, read alone, makes no adequate provision therefor; but the statute must be read in connection with the provisions of the charter.

In order to accept the interpretation of these two instruments urged by the complainant, it would be necessary to interpret the charter provision as meaningless. If paragraph fifth of the charter is restrictive only, and we accept the assumption that the statute does not authorize the alteration by amendment of the voting powers or the creation of prior issues, then there is nothing to restrict by the inclusion of clause (d) and clause (f) of the paragraph mentioned. It would also be necessary to eliminate as meaningless the clause "except as herein provided" embraced in the first sentence of this paragraph. The interpretation which complainant urges would exclude the rather clear inference to be drawn from the exception. Where possible, we must endeavor to give effect to all provisions of the statute and certificate which are sufficiently clear and definite as to be reasonably understood and expressive of the agreement between the incorporators and between the corporation and its stockholders.

Such provisions are a constituent part of the contract entered into. I can only read the provisions of section 26 in conjunction with the aforementioned provision of the charter as embodying a consent on the part of holders of the first preferred stock that the charter may from time to time be amended by way of changing the voting powers of any class of stock, or by creating issues of stock having priority over the first preferred, provided the necessary majority of 75 per cent. consent thereto or vote therefor.

The contract of the holders of the first preferred stock being thus interpreted, there arises no divergence in the legal authorities applicable thereto. An analysis of the decisions cited by the complainant, in support of his objection to the termination of the voting powers of the first preferred, include no case where consent to such an amendment was included in the original charter of the corporation.

It is true, however, that the character of the voting right involved in the case at bar is unlike that appearing in most of the decided cases. In most of the cases wherein the courts have been called upon to deal with the validity of an amendment terminating the voting rights of a given class or classes of stockholders, the voting power has been one which permitted a general voice or participation in the management of the corporation; that is, the class of stock affected was permitted to vote, share for share, with the common in the election of directors or other corporate officers. In the present case, however, the first preferred stock has had no voting power, except certain contingencies exist—the nonpayment of dividends for a specified period and/or failure in respect to the sinking fund. At no time does the first preferred stock have a vote with other classes of stock. Its right, when asserted, is exclusive, and temporarily suspends the voting right of the common stock. The device thus created clearly represents a means agreed upon as a method of protecting the vested interest represented by unpaid accrued dividends (see Morris et al. v. American Public Utilities Co., 14 Del. Ch. 136, 122 A. 696), and the corporate obligation in respect to the sinking fund payments.

Such a voting power would not be subject to extinguishment by amendment, unless specifically so provided in the original charter and/or enabling corporate statute. In this case, as already observed, the necessary consent to the alteration of this special voting right appears to have been given in the original contract of association by the holders of the first preferred stock.

The contention is presented that, even if it be proper to create the two issues of prior preferred stock, no dividends thereon can be paid from either past or future earnings, until all accrued dividends upon nonassenting first preferred stock shall have been paid.

The plan of reorganization, as expressed in the proposed amendment, carefully preserves all rights of nonassenting first preferred stockholders in respect to earned surplus now available for dividend purposes. The contention, therefore, amounts only to this: Will it be proper for the corporation to pay from future earnings dividends upon the prior preferred stocks in advance of the

payment in full of all accrued dividends upon nonassenting first preferred stock? That question now intrudes only because of the imminence of the payment of the first dividend upon these prior issues.

I have no hesitancy in holding that the payment of dividends upon both of the preferred issues from future earnings, in advance of the payment of the accrued dividends upon the first preferred, is proper, and that the provision made in the proposed amendment in respect to the surplus now available gives full recognition to the complainant's rights therein.

The complainant has cited the case of General Investment Co. v. American Hide & Leather Co., 98 N. J. Eq. 326, 129 A. 244, 44 A. L. R. 60. The concurring opinion of White, J., in this case clearly supports complainant's position. He said:

"It seems to me, therefore, that as to the accrued unpaid dividends upon the preferred stock up to the present time complainants cannot be deprived of their vested present property right to have those dividends paid to them at some future time out of earnings of the corporation before the payment of any dividends which did not have priority over them at the time they from time to time matured."

I cannot follow this conclusion. I believe the better principle to be that a holder of stock upon which a cumulative or guaranteed dividend has accrued and remains unpaid has a vested interest, which may not, in the absence of prior consent, be extinguished in any corporate surplus which might be lawfully applied in payment of such accrual to the extent not in excess of such arrears, and in the proportion that the dividends accrued upon his stock bears to the total accrued and unpaid dividends upon all the outstanding stock of the same class. With this principle, the amendments before us are not in conflict.

There remains for consideration the most troublesome issue in the case, namely: Was it legal for the certificate to be so amended as to eliminate for the future the sinking fund provision?

Paragraph fourth (d) of the original certificate of incorporation contained the following provision:

"(d) A sinking fund for the purchase or redemption of the first preferred stock shall be created and used as follows:

"The company shall on and before the last day of the year 1922, and annually thereafter on or before the last day of each and every succeeding year, make fixed payments into said sinking fund of at least twenty thousand ($20,000) dollars. All such sinking fund payments, as and when the same become due and payable, shall be deposited by the company in the Rhode Island Hospital Trust Company, a corporation created by the General Assembly of the state of Rhode Island, and located at Providence, Rhode Island. Such sinking fund shall be used each year to purchase or redeem outstanding first preferred stock of the company and for no other purpose and if stock is purchased then upon the terms and in the manner provided in this paragraph, and if redeemed then upon the terms and in the manner provided in paragraphs (f), (g), (h) and (i) hereof as the same may be applicable. * * *

"All stock so purchased shall be immediately turned in by said Rhode Island Hospital Trust Company and canceled forthwith and shall not again be reissued."

This obligation is a contractual undertaking on the part of the corporation. It represents one of the substantial inducements, pursuant to which all the outstanding first preferred stock was sold. It amounts to an undertaking between the corporation and the individual holder of first preferred shares that in X number of years all shares of that class of stock will be redeemed through purchase or redemption. The obligation is qualified by a condition which the law imposes, namely, that its fulfillment may not prejudice the rights of creditors.

Counsel for the respondent have in their briefs endeavored to establish a similarity between the rights resulting from this contract and the preference rights, such as cumulative dividends and dividends at a certain rate. In this connection the court's attention is called to one of the latter paragraphs, subdivision third, of respondent's charter, as follows:

" * * * Provided it shall not use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of its capital. * * * "

Attention has also been called to a provision of the Delaware law (Rev. Code 1915, § 1933), as follows:

" * * * Provided that no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation. * * * "

This provision of the Delaware law was in effect in 1920.

Relying upon this limitation in both the charter and the statute, respondent contends that the operation of the sinking fund is limited by the requirement that it can only be met out of earnings or surplus over and above its capital, and that, being so limited, it is in its nature a preference, a participation in earnings, analogous to the right to receive dividends. The meaning of the charter and statutory restrictions quoted was interpreted by the Delaware court in the case of In re International Radiator Co., 10 Del. Ch. 358, 92 A. 255. In that case the court said:

"As here used, this means the reduction of the amount of the assets of the company below the amount represented by the aggregate *outstanding shares* of the capital stock of the company. In other words, a corporation may use only its surplus for the purchase of shares of its own capital stock. *'Capital' does not, in this connection, mean the assets* of the company, for, of course, the assets are reduced when any of it is used by a corporation to purchase shares of its own capital stock. It must have some other meaning then. The statute must mean, therefore, that the funds and property of the company shall not be used for the purchase * * * of its own capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock."

That interpretation was accepted by the Circuit Court of Appeals, Third Circuit, in the case of West Penn Chemical & Mfg. Co. v. Prentice, 236 F. 891.

One of the conditions of the sinking fund provision is that the stock acquired from the application of the fund shall be canceled and not again reissued. The operation of the fund to date, through the purchase of stock below par, has resulted in a substantial capital gain to the corporation. At the close of the year 1927 the capital surplus thus created amounted to $130,600. The corporation also has an earned surplus of over $192,000. No impairment of capital from compliance with the terms of this obligation is now threatened.

The corporate surplus now available, as appears from the stipulation on file, if not otherwise impaired, is sufficient to safeguard the application of the sinking fund for some years to come, without transgressing the aforementioned charter and statutory restrictions.

No case has been cited, and none have been found, wherein it has been held that an undertaking such as here being considered is a mere preference. Practically all of the cases to which the court's attention has been called are cases wherein the rights of creditors have been involved. In those cases the courts have correctly and uniformly held that such special undertakings do not create rights in the stockholder on a parity with, or in preference to, the rights of creditors.

There is in the original charter no mention of, or consent to, an amendment which would cancel the obligations to annually apply $20,000 to the retirement of outstanding first preferred stock. In the corporation statute of Delaware in effect in 1920 there is no authority to adopt an amendment of this character over the objection of a dissenting holder. No court appears to have permitted an amendment of this character by majority vote under the authority of the general clause, such as "any other change * * * that may be desired."

The amendment which would cancel the sinking fund obligation is clearly invalid under the law as it stood in 1920. In fact, the Delaware court, in the case of Morris et al. v. American Public Utilities Co., supra, decided in 1923, under the amendatory provisions of the statute as they were in 1920, went so far as to hold that accrued and unpaid dividends upon stock, in respect to which no suit could be brought and for the payment of which no time could be fixed, represented nevertheless such a vested right and obligation of the corporation as to be immune from cancellation by charter amendment. To be sure, accrual had taken place in the past, but the right to present payment was yet to mature. In the Morris Case the court said, referring to the decision of the New Jersey court in Pronick v. Spirits Distributing Co., 58 N. J. Eq. 97, 42 A. 586:

"The Pronick Case is a clear authority to the effect that a clause such as we find here conveying *a general power of amendment* of a certificate of incorporation cannot have the effect of authorizing an alteration and rearrangement of the relationship existing between the stockholders inter sese, and I accept it as expressive of the correct rule. The conclusion * * * is that the complainants are entitled to a preservation of their rights to the 24 per cent. dividends heretofore accrued on their stock and unpaid. The corporation cannot without their consent destroy it. To hold otherwise would be to say that other people might take from a man his vested property right against his will and appropriate it to others."

Clearly the contractual obligation long since entered into, to set apart a definite sum

each year at a definite time for the redemption of the first preferred stock, more fully answers the requirements of a vested property right than does an expectancy of future payment of undeclared dividends.

The respondent, however, contends that the validity of the charter amendments here involved is to be determined under the Delaware law, not as it was in 1920, but as it was on December 27, 1928, when the amendments were adopted. This contention is predicated upon section 82 of the Delaware law of 1920 (Rev. Code 1915, § 1996), which is as follows:

"This chapter may be amended or repealed, at the pleasure of the Legislature, but such amendment or repeal shall not take away or impair any remedy against any corporation under this chapter, or its officers, for any liability which shall have been previously incurred; this chapter and all amendments thereof shall be a part of the charter of every such corporation except so far as the same are inapplicable and inappropriate to the objects of such corporation."

Subsequent to June 10, 1920, and prior to December 27, 1928, the Legislature of the State of Delaware amended its general corporation statute, section 26 (Revised Code 1915, § 1940), to read in part as follows:

"Any corporation of this State existing prior to the tenth day of March, 1899, whether created by special act or general law, or any corporation created under the provisions of this chapter, may, from time to time, when and as desired, amend its certificate of incorporation * * * or by increasing or decreasing its authorized capital stock or reclassifying the same, by changing the number, par value, designations, preferences, or relative, participating, optional, *or other special rights of the shares,* or the qualifications, limitations or restrictions of such rights, * * * or by making any other change or alteration in its certificate of incorporation that may be desired. * * *" 35 Del. Laws, c. 85, § 10.

The amended section 26 would seem by its all-inclusive terms, particularly "or other special rights of shares," to authorize an amendment which would cancel even a sinking fund obligation such as is here presented, provided this amended section is applicable and controlling in respect to a corporation organized prior to its enactment. It is unescapable that the sinking fund obligation is a special right of the shares, in that it is a contractual commitment running with the shares for the benefit of whoever holds the shares.

The question then is: Does section 82 of the earlier statute make applicable and controlling all amendments to the Delaware statute adopted prior to December 27, 1928?

The case of Davis et al. v. Louisville Gas & Electric Co. (Del. Ch.) 142 A. 654, and the case of Federal Mining & Smelting Co. v. Wittenberg (Del. Ch.) 138 A. 347, 55 A. L. R. 1, would, if controlling, give support to respondent's contention.

In the Davis Case, supra, the Chancellor went so far as to say in reference to section 82:

"Thus all future amendments to the act were written by that language into the defendant's charter as effectively as was the original act."

The decisions of the Delaware courts have been studied with the greatest deference. I am compelled, however, to the conclusion that they do not settle the point here involved. A federal court may be bound by the interpretation placed upon a state statute by a court of last resort of that state, but is not bound by the decision of the state court as to whether so interpreted there is a resulting impairment of the "obligation of contracts" or the taking of property "without due process of law," within the meaning of the Constitution of the United States. The issue presented necessitates an examination of the scope and effect of a reservation of power by a state to amend by future act any enabling legislation under which a corporation is organized.

In the now famous Dartmouth College Case, decided in 1819, 4 Wheat. 518, 4 L. Ed. 629, with which any study of the issue here presented must begin, Mr. Justice story, at page 712, of 4 Wheat., says:

"In my judgment it is perfectly clear, that any act of a Legislature which takes away any powers or franchises *vested by its charter* in a private corporation or its corporate officers, or which restrains or controls the legitimate exercise of them, or transfers them to other persons, without its assent, is a violation of the obligations of that charter. If the Legislature mean to claim such an authority, it must be reserved in the grant."

In support of this principle, the court cites the case of Wales v. Stetson, 2 Mass. 143, 146, 3 Am. Dec. 39, in which case Parsons, J., had already said:

"* * * The rights legally vested in this, or in any corporation, cannot be controlled or destroyed by any subsequent Statute, unless a power for that purpose be reserved to the Legislature in the act of incorporation."

Following the decision in the Dartmouth College Case, the states began to incorporate in their Constitutions and legislative grants of corporate charters reservations of a right to repeal and amend. With the development of modern general corporation legislation, these restrictions have been generally incorporated. The language varies in some instances from that of section 82 of the Delaware law, but all being expressed in general terms cannot greatly vary in their legal effect or sufficiency.

At the outset, it is important to keep in mind that we are dealing with a reservation, a refusal to part with power. No reservation can be construed as giving or vesting in the state a power which it did not before have. The state has no power to impair the obligation of contracts to which it is not a party. No reservation, however artfully worded, can give it that power.

With this proposition, such cases as Calder v. Michigan, 218 U. S. 591, 31 S. Ct. 122, 54 L. Ed. 1163, which has been cited, are not in conflict. In that case the court only decided that a charter granted with a reservation of power to amend or repeal could be repealed. The court expressly did not pass upon the rights of the parties resulting from the incidental interference with outstanding rights arising from dealings with third persons. The court said:

"The only question before us now is the validity of the judgment ousting the defendants from 'assuming to act as a body corporate, and particularly under the name and style of the Grand Rapids Hydraulic Company.' "

The history and purpose of these reservation clauses was to permit the states to reserve a right to terminate or amend its contracts with corporations, the Supreme Courts having held· that a charter granted to a corporation is a contract. As said by Mr. Justice Bradley, with whom concurred Mr. Justice Field, in the dissenting opinion in the case of Miller v. State of New York, 15 Wall. 478, 499, 21 L. Ed. 98:

"Whilst the Legislature may reserve the right to revoke or change its own grant of charter rights, it cannot reserve a right to invalidate contracts between third parties, as that would enable it to reserve the right to impair the validity of all contracts, and thus evade the inhibition of the Constitution of the United States."

Mr. Justice Field, in the case of Santa Clara County v. Southern Pac. R. Co. (C. C.) 18 F. 385, 406, reviews with force and clarity the effect of these reservation clauses:

"This reservation, in whatever form expressed, applies only to the contract of incorporation, without which it would be beyond revocation or change by the state. It removes any impediment which would otherwise exist to legislation affecting that contract. It leaves the corporation in the same position it would have occupied had the Supreme Court held in the Dartmouth College Case that charters are not contracts, and that laws repealing or modifying them do not impair the obligation of· contracts. It accomplishes nothing more; therefore, the legislation authorized by it must relate to the contract embodied in the charter, amending, altering, or abrogating its provisions. Legislation·touching any other subject is not affected by it—neither authorized nor forbidden. Its whole scope and purpose is to enable the state to pass laws with respect to the charter—the contract of incorporation—which would otherwise be in conflict with the prohibition of the federal Constitution. Legislation dealing with the corporation in any other particular must, therefore, depend for its validity upon the same conditions which determine the validity of like legislation affecting natural persons."

Again in the case of Greenwood v. Union Freight R. Co., 105 U. S. 13, 19, 26 L. Ed. 961, the court said:

"In short, whatever power is dependent *solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the state,* is abrogated by the repeal of the law which granted these special rights.

"Personal and real property acquired by the corporation during its lawful existence, *rights of contract,* or *choses in action* so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such a repeal; and the courts may, if the Legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of such a corporation, to their interest in its property, are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights."

See, also, Opinion of the Justices, 66 N. H. 629, 33 A. 1076, and opinion by Holmes, J., in Woodward v. Central Vt. Ry. Co., 180 Mass. 599, 62 N. E. 1051.

When a corporation has been created, and is not inhibited so to do by its charter, it has the same right as an individual to enter into contracts with third persons, provided, of course, those contracts are not ultra vires. While the state may in some cases deny this

right to a corporation when it is not so restricted, the source of that power is no part of the corporation grant. As said by Chief Justice Marshall in the case of Providence Bank v. Billings & Pittman, 4 Pet. 514, 562, 7 L. Ed. 939:

"The great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men."

If a state were to pass an act reserving the right to alter or amend all contracts subsequently entered into, whether between individuals or corporations, would any one seriously urge its validity? Could a state by its own act thus invalidate the clear intendment of article 1, § 10, of the Constitution, by the theoretical reasoning that all contracts thereafter would be made with this reservation read into them as a term and condition, and would not, therefore, be impaired?

The power reserved by the state to alter, repeal, or amend gives the state no special control over those features of the corporate existence and activities which are enjoyed in common with individuals and derived from the general law, rather than from the content of the corporate grant.

In the case of Bank of the Old Dominion v. McVeigh, 20 Grat. (61 Va.) 457, 466, the court said:

"It is undoubtedly true that it is in the power of the Legislature, under its reserved rights, to alter or amend the charters of banking institutions, or to take them away altogether. But it does not follow that in doing this it may interfere with and abrogate contracts lawfully made under such charters, or disturb rights already legally vested. under them in the course of their legitimate business. The Legislature did reserve the right to modify and amend the charter of the Bank of the Old Dominion; but it did not and could not reserve the right to alter contracts made under the old charter. All contracts made in pursuance of its charter are to be construed with reference to the charter in force at the time they were made. The charter may be changed, but the contracts made under that charter cannot be altered by the Legislature."

See Dow v. Northern R. R. Co., 67 N. H. 1, 36 A. 510.

This distinction is important, in view of the modern practice of writing into a voluminous instrument, called a charter or certificate of incorporation, various agreements. There are included the provisions essential to corporate existence, the restrictive provisions imposed by the state, which together constitute the contract with the state. There are also often included various agreements between the stockholders and the corporation and between the stockholders inter sese. It is a convenient place to record them. But to say that, because they are there recorded, the state may by direct act, or by empowering a majority so to do, impair the obligation of such commitments, is to ignore the substance and character of the subject-matter and to be led astray by the title to the document.

No effort will be made to reconcile all of the decided cases dealing with this problem. It cannot be done. Special circumstances relating to corporate needs, expediency, the plaintiff appearing as a professional obstructionist, a dominant public interest, all have played a part in creating a seemingly hopeless confusion of the law. If, however, we accept the proposition that within the purview of the rights and privileges granted by the state are included such matters as the definition of the scope and nature of the corporate enterprise, the amounts and kinds of capital stock, the scheme of management of the corporation, including the protection of creditors and method of electing officers, as well as safeguarding a definite public interest, then nearly all of the cases may be read in harmony with, and support of, the principles here stated.

Certainly with that liberal definition of what constitutes the subject-matter of the contract with the state we find no difficulty in reconciling Lord v. Equitable Life Assur. Soc., 194 N. Y. 212, 87 N. E. 443, 22 L. R. A. (N. S.) 420, Looker v. Maynard, 179 U. S. 46, 21 S. Ct. 21, 45 L. Ed. 79, Miller v. State of New York, 15 Wall. 478, 21 L. Ed. 98, and Erie R. Co. v. Williams, 233 U. S. 685, 34 S. Ct. 761, 58 L. Ed. 1155,.51 L. R. A. (N. S.) 1097, as well as most of the other cases cited by counsel.

In the case at bar the respondent corporation entered into an agreement with the holders of the first preferred stock to reduce the number of shares outstanding by setting aside and employing to that end the sum of $20,-000 annually. This commitment was one of the inducements for the purchase of the stock. It was a contract, qualified only by the conditions imposed by law. It was a contract that could have been lawfully made with the several purchasers of the first preferred stock, entirely apart from the charter or certificate. It was there set down for convenience and in conformity to modern custom. There was at the time no limitation upon the corporate powers of the respondent, other than those al-

ready discussed, sufficiently definite to be read as a term and condition of the contract.

To say that a general reservation on the part of the state of a right to repeal or enact future amendments to the corporation law gave to the state a power to authorize the cancellation of this agreement, is to disregard every sound principle of law and to misconstrue legal history. As a matter of fact, the state has repealed nothing, and by its amendments it purported to extend the powers of the corporation. In this case the majority of the first preferred stockholders have seized upon an apparent extension of authority as a means by which to abrogate a corporate commitment to other stockholders, to which commitment the state never was a party, and in respect to which there has been no showing of public interest, and only a meager, if any, showing that the abrogation of the sinking fund agreement would enable the corporate entity to function better as an owner and operator of the Biltmore Hotel.

I am, therefore, compelled to the conclusion that the charter amendments, in so far as they purport to eliminate the sinking fund obligation, are invalid, and the complainant is entitled to have his interest therein protected.

A draft decree, in accord with these determinations, may be presented for settlement.