## KETTLER BROTHERS, INC. *v.* DEPARTMENT OF LICENSING AND REGULATION, DIVISION OF LABOR AND INDUSTRY FOR THE STATE OF MARYLAND

[No. 1202, September Term, 1977.]

*Decided June 12, 1978.*

The cause was argued before MOORE, LISS and WILNER, JJ.

*James R. Trimm,* with whom were *Trimm, Donohue, McDanald, Willis & McGuckian* on the brief, for appellant.

*Walter Timothy Seidel, Assistant Attorney General,* with whom was *Francis Bill Burch, Attorney General,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

By Laws of Md., 1973, ch. 59, the General Assembly enacted the Maryland Occupational Safety and Health Law,[1] patterned largely after the Federal Occupational Safety and Health Act of 1970. A thorough, but concise, history of the Maryland Act and the regulations promulgated under it, is set forth in *J. I. Hass Co. v. Dep't. of Lic. and Reg.,* 275 Md. 321 (1975).

The primary purpose of the Act, as stated in its title, was "to assure safe and healthful working conditions for the citizens of the State of Maryland by providing for the establishment of safety and health standards, procedures for enforcement of and compliance with such standards, and penalties for violation thereof...." This important and laudable purpose is to be carried out through a cooperative effort among the State government, represented by the Division of Labor and Industry of the State Department of Licensing and Regulation,[2] employers, and employees, each of whom are given certain correlative rights and responsibilities.

The State's role in this partnership consists primarily of the adoption and enforcement of basic occupational safety and health standards. Section 31 of article 89 authorizes the Commissioner of Labor and Industry, with the advice of the Occupational Safety and Health Advisory Board, to adopt reasonable rules, regulations, and standards "for the prevention of conditions detrimental to safety and health in every employment or place of employment in the State...." Section 35 permits the Commissioner, or his representatives, to enter and inspect virtually every place of employment to

[1]. *See* Md. Annot. Code art. 89, §§ 28-49B.

[2]. More particularly, by the Commissioner of Labor and Industry, who heads the Division, the Occupational Safety and Health Advisory Board, and the Maryland Occupational Safety and Health Agency, both of which are units within the Division.

make certain that there is actual compliance with these regulations.[3] If he finds a violation of one or more of the regulations, he is authorized by § 36 to issue a written citation and by § 37 to propose a civil penalty. If the employer contests the citation, he is entitled to a hearing before a hearing examiner; and, if aggrieved by the decision of the hearing examiner, he is entitled to review by the Commissioner. From a final order of the Commissioner, § 38 provides for judicial review.

Section 32 sets forth the basic responsibilities of employers and employees.[4] Subsection (a) requires each employer to (1) "furnish to each of his employees employment and a place of employment which are safe and healthful as well as free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees," and (2) comply with the regulations promulgated by the Commissioner. Subsection (b) obligates each employee to comply with all such regulations "which are applicable to his own actions and conduct in the course of his employment."

The heart of the enforcement mechanism to assure compliance with the Commissioner's regulations is the imposition of civil penalties, provided for in § 40, although criminal penalties are also possible under § 41. Only employers are subject to these penalties; there are no direct sanctions in the law applicable to employees who fail to comply with their obligation under § 32 (b). Section 40 views violations as being of three possible types: (1) willful or repeated violations, for which an employer may receive a civil penalty not to exceed $10,000 for each violation; (2) serious violations, for which the employer *shall* be assessed a penalty not to exceed $1,000 for each such violation, and (3) other than serious violations, for which the employer *may* be assessed a penalty not to exceed $1,000 for each such violation.

---

**3.** In this Opinion, our use of the term "regulations" encompasses as well rules, standards, and orders. We note here the very recent decision of the United States Supreme Court in Marshall v. Barlow's, Inc., 436 U. S. 307 (1978) placing restrictions on warrantless inspections by Federal OSHA officials. Suffice it to say that Kettler did not raise any objection to the inspection in this case.

**4.** Additional, and more particular, rights, duties, and responsibilities of employers and employees are provided in other sections of the subtitle.

We are concerned in this appeal with definitional aspects of "serious" and "other than serious" violations. Section 40 (b) states that a "serious" violation shall be deemed to exist in a place of employment,

"... if there is a substantial probability that death or serious physical harm could result from a condition which exists or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such place of employment *unless the employer did not and could not with the exercise of reasonable diligence, know of the presence of the violation.*" (Emphasis supplied.)

No definition is provided in the law for an "other than serious" violation. Section 40 (c) simply provides that:

"Any employer who has received a citation for a violation of any provision of this subtitle or any rule, regulation, standard, or order promulgated pursuant to this subtitle and such violation is specifically determined not to be of a serious nature, may be assessed a civil penalty not to exceed $1,000.00 for each such violation."

There is no language in the statute that, in the manner of § 40 (b), makes employer knowledge, actual or constructive, a pre-condition to or requisite element of a violation that is not found to be "serious". The question before us is whether the law implies such a condition notwithstanding the statutory silence.

Kettler Brothers, Inc. was in the process of constructing 96 townhouses in a development near Gaithersburg known as Montgomery Village, when, shortly after 10:00 on the morning of September 29, 1976, Mr. Henry McCoy made a surprise visit to the jobsite. Mr. McCoy is an inspector for the Maryland Occupational Safety & Health Agency (MOSHA). He had with him a Federal Compliance and Health Officer, and was there to conduct a scheduled "target industry

inspection" — *i.e.,* to see if there were any unlawful safety violations.

As they toured the jobsite, escorted by the project superintendent, Robert Franklin, their attention was drawn to two men working on a scaffold.[5] The manner in which that scaffold had been constructed led to the issuance of two citations. Citation No. 1 charged that the pump jack scaffold was not equipped with standard guardrails, midrail and end rails, in violation of 29 CFR 1926.451 (y) (ii), which was characterized as a "serious" violation.[6] Citation No. 2 charged six "other than serious" violations, five of which also pertained directly or indirectly to the scaffold, and one concerned an unrelated condition that was corrected while the inspector was still on the scene.

Along with the two citations, MOSHA sent Kettler a notification that it intended to seek a civil penalty of $340 for the serious violation charged in Citation No. 1, and a penalty of $280 for two of the six "other than serious" violations charged in Citation No. 2.[7]

In accordance with § 37, a hearing on these citations was held before a hearing officer. There was little dispute that the conditions specified in the Citations were, in fact, present, or that they violated the standards mentioned in the Citations. This was established through the testimony and exhibits offered by Mr. McCoy, and, to some extent was corroborated by the testimony of Mr. Franklin, on behalf of Kettler. The "whole substance" of Kettler's defense, as stated in its subsequent appeal to the Commissioner was "whether the

5. Mr. Franklin stated that, when they first came upon the scaffold, no one was on it. He and Mr. McCoy then walked behind the building, and when they came back around to the front, the two employees were on the scaffold working.

6. References are made to Federal Regulations because they have been "adopted" as State standards by MOSHA. *See* COMAR, Vol. V, Title 9, Supp. 1, p. 358.

7. The proposed penalties were determined by a formula that considers the standard violated, the number of instances of violation, and whether the violation is "serious" or "other than serious", and then assigns a weight, ranging from 0 to 10, to four factors: the gravity of the violation, the good faith of the employer, the history of violations by the employer, and the number of employees working for the employer. No complaint is made by Kettler with respect to the *amount* of the penalties or to the method by which they were calculated.

violation was caused by the employer or caused by the very employees involved in the construction of the scaffolding."

Kettler's sole contention before MOSHA (the hearing examiner and the Commissioner), the Circuit Court for Montgomery County, and this Court is that the scaffold was erected, and used, without the knowledge of the Kettler supervisory personnel and in violation of clear, published company safety rules, and that, under those circumstances, Kettler may not be deemed to have violated the MOSHA standards, and certainly not penalized for such violations.

The relevant facts pertaining to this issue, as developed at the administrative hearing, were these:

(1) The scaffold had been erected earlier that morning by the two employees found working on it (assisted by a third employee). According to McCoy, "They told me they just put it up that morning and started working on it just before we got there." The record does not indicate when the three employees began to build the scaffold or how long it took to erect the structure.

(2) Mr. Franklin, the project superintendent, was not present when the scaffold was erected; but, as noted (footnote 5, *supra*), *he observed it prior to its use when he and Mr. McCoy toured the site*. He agreed that it was not proper, and claimed that "had we seen the scaffold built in that manner [we] would never have let them get up on the scaffold in the first place." In Mr. Franklin's absence, there is a "trim foreman" and a "frame foreman" in charge. The "frame foreman" was not at the jobsite on the day in question, but the "trim foreman" was present. According to Franklin, this "trim foreman", David Hill, was trimming when the scaffold was built. The record does not reflect whether Mr. Hill, or anyone else, observed or supervised the erection of the scaffold.

(3) According to Richard Hines, the construction superintendent for Kettler, the employer does not allow unqualified persons to erect scaffolding. However, he did not state, or even suggest, that the three employees who built this scaffold were unqualified. No one has to "authorize" the building of scaffolding — the employees "normally build the

scaffold on their own." Hines further stated that it is not a normal practice for the job supervisor to watch the scaffold being built; rather, he said, the procedure is for the job supervisor to inspect the scaffold after it is built, and the employees are not supposed to work on it until such inspection has taken place.

(4) Kettler has prepared a series of "safety work rules", one of which provides: "If you work on scaffolding, be sure that guardrails are in place. Report unsafe scaffolding to your supervisor." Mr. Franklin stated that each employee of Kettler is made aware of these rules, and is subject to discipline for violating them. No one made a report to Franklin, or apparently any other supervisory employee, of the unsafe condition of the scaffold.

(5) The procedure mentioned by Mr. Hines — that employees are not to begin using a scaffold until it has been inspected — is not formalized in the safety work rules. In this instance, no such inspection was made; and, to the extent that the procedure represents company policy, it was apparently violated by the two employees involved.

(6) Kettler has an extensive general safety program for its employees, which includes financial incentives for maintaining safe conditions and discipline for violating safety rules. Mr. McCoy gave Kettler high marks for its general safety program, but stated that, at this particular site, the implementation of that program was only "average". He testified that this site appeared to be "in a much less safe condition" than other Kettler construction sites he had visited.

Upon this evidence, the hearing examiner agreed with Mr. McCoy that a "serious" violation occurred, as charged in Citation No. 1, and that five of the six "other than serious" violations charged in Citation No. 2 also existed. He found, in addition, that the penalties recommended by Mr. McCoy, aggregating $620, were appropriate.[8] Aggrieved by these determinations, Kettler sought review by the Commissioner

---

8. No penalty had been proposed with respect to the alleged violation found not to exist.

of Labor and Industry who summarily affirmed the conclusions reached by the hearing examiner.

Kettler then appealed to the Circuit Court for Montgomery County, which found that the record clearly supported the administrative determinations as to the "other than serious" violations, and those determinations (and the penalties entered with respect to them) were affirmed. With regard to the "serious" violation charged in Citation No. 1, however, the court found that Kettler had neither actual nor constructive knowledge, which, it concluded § 40 (b) made a prerequisite for a "serious" violation. Accordingly, the court reversed that determination and remanded the matter to the Commissioner "for the proper imposition of a penalty as other than a serious violation." [9] No appeal was taken by the Commissioner from that part of the judgment.

Kettler points to the decision of the Court of Appeals in *J. I. Hass Co. v. Dep't of Lic. and Reg., supra,* 275 Md. 321, and a number of federal cases arising under the Federal Act as authority for the proposition that "knowledge [*i.e.,* foreknowledge] is an essential element in both 'serious' and 'non-serious' violations", and that, consequently, absent proof of such knowledge, an employer may not be found culpable of and penalized for a "non-serious" violation. As clarified by counsel at oral argument, appellant's contention, more precisely, is that the statutory condition set forth in § 40 (b) with respect to a "serious" violation — no violation "unless the employer did not and could not with the exercise of reasonable diligence, know of the presence of the violation" — also is applicable, by implication, to "other than serious" violations, and that Kettler did not possess that degree of knowledge with respect to the deficient scaffold.

In *Hass,* the employer was engaged in painting the new span of the Chesapeake Bay Bridge. Two employees, while being lowered into position to do some sandblasting, fell 40 feet into the Bay when a winch cable unravelled and their scaffold collapsed. One of the employees died from the fall.

9. The effect of this, at least implicitly, was agreement that the condition alleged in Citation No. 1 existed and that it constituted a violation of 29 CFR 1926.451 (y) (ii), but that, because of the lack of actual or constructive knowledge on Kettler's part, it could not constitute a "serious" violation.

The employer was charged with violating two safety standards, both violations having been characterized as "serious and repeated". One involved the failure to ensure that the employees were wearing safety belts secured by a part of the bridge, and the other resulted from the failure to have guardrails 42 inches high, with a midrail and toe boards, in use on all four sides of the scaffold. Some six weeks earlier, the employer had been cited, and penalized, for similar violations following the death of another employee, which it did not contest.

The particular relevance of *Hass* arises from the Court's discussion of the first of the two violations. The employer had provided lifelines (safety belts) for the employees that were, in fact, secured to the bridge. The problem was that these employees, fearful of becoming ensnarled in the lines while the scaffold was being lowered, had unhooked their belts moments before the accident occurred. The employer argued, as the Court stated, "with considerable logic", that if the standard were read to require that the belts be *worn* rather than *furnished,* it "would impose a requirement incapable of being met — constant surveillance by at least one monitor for each pair of workmen." Evidence of deliberate, specific, and persistent attempts by the employer to encourage employees to wear safety belts was noted.

The Court drew upon a number of federal cases, both judicial and administrative, holding that the comparable Federal Act was not intended to impose "strict liability" on the employer, but rather to eliminate only "preventable hazards",[10] and that a requirement that "each employee be constantly watched by a supervisor, would be totally impractical and, in all but the most unusual circumstances, an unnecessary burden." [11] Finding that "the common thread running through these cases . . . is that the employer cannot be charged with being an insurer, or be held accountable to a standard of strict liability", and that, under the State law

10. National Rlty. & C. Co., Inc. v. Occupational S. & H. R. Comm'n, 489 F. 2d 1257 (D.C. Cir., 1973); *see* 275 Md. at 331, 332.

11. Secretary of Labor v. Canrad Precision Industries, Inc., 1971-1973 OSHD (CCH), ¶ 15,355 (1972), *aff'd* Brennan v. Occupational Safety & Health Review Comm'n, 502 F. 2d 946 (3rd Cir., 1974); *see* 275 Md. at 332.

"the effort made by the employer to prevent hazards is the focal point, not the happening of the accident", the Court reversed the determination with respect to the first (safety belt) violation.

The concepts enunciated by the Court in *Hass,* whether originally or through quotations from earlier decisions by other tribunals, appear to represent somewhat of an amalgamation of three distinct, yet inter-related, defenses that have been asserted with mixed success to charges under the Federal Act. These are: (1) impossibility of compliance, (2) isolated occurrence, and (3) employee resistance. *See* Hogan and Hogan, *Occupational Safety and Health Act,* Vol. 1, 1977, § 4.03.[12]

The first of these — impossibility of compliance — appears to be very limited in scope, and not truly applicable to the situation here. It requires a showing that compliance with the standard is actually impossible, and not merely inconvenient or expensive. According to Hogan and Hogan, *supra,* the elements of this defense are "(1) That compliance with the applicable OSHA standard would stop or severely hinder ongoing operations; and (2) that alternative safety measures are either being diligently attempted or are impossible under the circumstances." Neither of these elements has been shown to exist in this case.

The "isolated occurrence" defense may have arisen from a 1972 decision of the Federal OSH Review Commission. In

12. Each of these defenses, of course, is but an aspect or particular application of the more basic claim of employer "unforeseeability" and "unpreventability". The discussion of them arose initially in the context of citations for "serious" violations of the "general duty" clause (*i.e.,* the general obligation, stated both in 29 U.S.C. § 654 (a) (1) and in Md. Annot. Code art. 89, § 32, to provide a place of employment that is safe, healthful, and free from "recognized hazards" likely to cause death or serious harm. *See, for example,* National Rlty. & Co., Inc. v. Occupational S. & H.R. Com'n, *supra,* 489 F. 2d 1257. In subsequent cases, the same principles of foreseeability and preventability applicable to charges under the "general duty" clause were held applicable to alleged violations of specific standards (29 U.S.C. § 654 (a) (2)), upon the theory that "the employer's task of guarding against the aberrational action of specific employees who violate specific safety standards is essentially no less difficult than under the general duty clause." *See* Atlantic & Gulf Stevedores v. Occupational Safety, 534 F. 2d 541 (3rd Cir., 1976); Cape & Vineyard Div. v. Occupational S. & H. Rev. Com'n, 512 F. 2d 1148 (1st Cir., 1975). The Maryland Court of Appeals recognized no distinction in *Hass* which, as noted, involved alleged violations of specific standards.

*Secretary v. Standard Glass Co.,* 1971-1973 OSHD (CCH) ¶15,146 (1972), the Commission held that where an employer had done virtually everything possible to assure that its employees wore their "hard hats", it was not subject to penalty because two employees were found without the hats on, in violation of company rules. The Commission stated, in explanation of its decision, that,

"An isolated brief violation of a standard by an employee which is unknown to the employer and is contrary to both the employer's instructions and a company work rule which the employer has uniformly enforced does not necessarily constitute a violation" [of the Act by the employer].[13]

Cases in which this defense has been successful have often involved either wearing apparel (hardhats [14] or safety gloves [15]) or personal safety equipment such as belts or lines [16] — *i.e.,* devices that the employee can easily unhook or take off quickly, momentarily, and, in the absence of constant, and impractical, monitoring, without detection. In that, or generally similar, context, the occurrence is often the product of the individual employee's personal resistance to complying with the safety standard, as in *Hass,* or deliberate disobedience or disregard of specific instructions or warnings by the employer,[17] regardless, and indeed in spite, of all reasonable efforts by the employer to enforce compliance, and may, from the employer's point of view, actually border on impossibility of assuring compliance. Thus, the nexus between the second and third defenses is a very close one in many instances.

---

**13.** This passage was quoted by the Court of Appeals in *Hass. See* 275 Md. at 333.

**14.** *See* Secretary v. Champlin Petroleum Co., 1975-1976 OSHD (CCH) ¶19,981 (1976).

**15.** *See* Secretary v. Utilities Line Construction Co., 1976-1977 OSHD (CCH) ¶21,098 (1976).

**16.** *Hass,* 275 Md. 321; *also* Secretary v. Texas Window Cleaning Co., 1975-1976 OSHD (CCH) ¶20,150 (1976).

**17.** Brennan v. Occupational Safety & Health Review Com'n, 501 F. 2d 1196 (7th Cir., 1974); Horne P. & H. Co. v. Occupational S. & H. Review Com'n, 528 F. 2d 564 (5th Cir., 1976); Brennan v. Butler Lime and Cement Company, 520 F. 2d 1011 (7th Cir., 1975).

This is not the case here, however. These violations were not momentary or beyond reasonable efforts at detection. It must have taken some time to erect the scaffold, and the deficiencies in its construction were easily recognizable. The "trim foreman" was at the jobsite. Mr. Franklin himself noticed the scaffold, with its obvious deficiencies, prior to its being used, and yet did nothing to call someone's attention to the problem or to require that the unsafe condition be corrected. Even if the statutory criterion of employer knowledge governing a "serious" violation were, by implication, applicable to "other than serious" violations, we cannot agree with Kettler, under the circumstances evident here, that "the employer ... could not with the exercise of reasonable diligence, know of the presence of the violation." There was sufficient evidence in the record from which the administrative agencies and the Circuit Court could reasonably have found that the quantum of "constructive" knowledge required of the employer under § 40 (b) existed in this case. We therefore need not consider whether, as an abstract proposition, such knowledge is, in fact, required for an "other than serious" violation.

With the existence of sufficient evidence to show that, with the exercise of reasonable diligence, Kettler could have become aware of and thus have prevented the defective condition, the evidence pertaining to its general safety program loses much of its relevance. *See Green Mt. Power v. Com'r of Labor and Industry,* 383 A. 2d 1046 (Vt., 1978), where, at page 1053, the Supreme Court of Vermont observed:

> "Delegating the responsibility of implementing the company's safety policies to rank and file employees, while under the immediate supervision of managerial personnel, does not comport with either the letter or the spirit of VOSHA. To hold otherwise would mean that once an employer provides its employees with safety equipment and issues orders or instructions regarding the safe use of that equipment, the employer is free to disregard the employee's actual compliance with those

instructions. To say the company invokes disciplinary measures for noncompliance with its safety rules is not enough. Although such after-the-fact measures are within the intendment of the Act, actual supervision during the performance of a job, where feasible, also is intended."

*Judgment affirmed; appellant to pay the costs.*